**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, *ex rel.* | : | **CIVIL ACTION** |
| **WILLIAM A. THOMAS** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SIEMENS AG**, *et al.* | : | **NO. 09-4414** |

## <u>MEMORANDUM OPINION</u>

Savage, J.                                                              **April 23, 2010**

        In this action brought under the False Claims Act ("FCA"), relator William Thomas

("Thomas") contends that the defendants fraudulently induced the government to pay them

more than it should have for the purchase of capital medical equipment by misrepresenting

the extent of the pricing discounts given to other customers.  The alleged false statements

were made on Discount and Pricing Information forms ("DPI") submitted to the Veterans

Administration ("VA") as required by federal procurement regulations known as the Federal

Acquisition Regulation ("FAR").  The discounts are relied upon by the government in

negotiating the price for goods it purchases.

        Thomas has sued Siemens Medical Solutions USA, Inc. ("SMS") and its parent,

Siemens Corporation, and Siemens Corporation's parent, Siemens Aktiengesellschaft

("Siemens AG"), a German corporation.  Thomas alleges that SMS manufactured and sold

the medical equipment to the government.  SMS, which he alleges is controlled by

Siemens Corporation and Siemens AG, sells capital medical equipment, such as CT

scanners, MRI scanners and nuclear medicine equipment, to private hospitals, both directly

and through hospital group purchasing organizations, and to governmental agencies.

        SMS and Siemens Corporation have filed a joint motion to dismiss the plaintiff's

second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Thomas has failed to state a "false statement" cause of action under § 3729(a)(2) or any other theory of liability under the FCA.[1]  Siemens Corporation also contends that Thomas has failed to state any claim against it, but on grounds that it played no part in the contracting process.

Siemens AG has filed its own motion to dismiss, challenging service of process and personal jurisdiction, and also arguing that Thomas has failed to state a claim against it. With respect to service of process, Siemens AG argues that Thomas failed to serve Siemens AG as required through the Hague Convention and has not renewed his attempt to serve Siemens AG through any acceptable means.  Thomas does not dispute his failure to serve Siemens AG through the Hague Convention, but contends that compliance with the Hague Convention is not necessary in this case because Siemens AG's subsidiary, Siemens Corporation, could be deemed Siemens AG's agent for purposes of service of process.

Accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to Thomas, we conclude that he has stated a cause of action under §§ 3729(a)(1) and (2) of the FCA against SMS, but not against Siemens Corporation and Siemens AG.  He has failed to state a cause of action against any defendant under § 3729(a)(7).

Because Thomas has not served Siemens AG with process in compliance with the Hague Convention, and has not alleged sufficient facts in the second amended complaint

---

[1] 31 U.S.C. §§ 3729-3733 (2003).  In May 2009, Congress amended the FCA.  As explained *infra*, n. 6, the amended statute does not apply to this case.

that Siemens Corporation may be considered Siemens AG's agent for accepting service of process, we conclude that service of process has not been effected upon Siemens AG. Even if Thomas had properly served Siemens AG, his second amended complaint and proposed third amended complaint[2] fail to state a claim against it.

## Background

In processing bids and awarding contracts, federal government contracting officers must follow the guidance and rules contained in the FAR, Title 48 of the Code of Federal Regulations, Chapter 1. To assist the government in getting a fair and reasonable price from vendors, the FAR requires that the purchasing agency obtain information regarding discounts given to the bidder's other customers that result in lower net prices than those offered to the government. The information is provided in the DPI, which requires the contractor to state the percentage discount from the price list that it is offering the government. *See* DPI, ¶ 4.a. Then, the contractor must answer whether it has

> in effect, for any customer or any class, discounts and/or concessions, including but not limited to the following, regardless of price list, which results in lower net prices than those offered the government in this offer.

*Id.*, ¶ 4.b.

The DPI sets out, by way of example, a non-exclusive list of these discounts: "rebates of any kind"; "multiple quantity unit pricing plan"; "cumulative discounts of any type"; "products that may be combined for maximum discounts"; and "other." *Id.*, ¶ 4.b.

In addition, the contractor must report the "best discount" from its price list in six

---

[2] Thomas has filed a motion for leave to file a third amended complaint. That motion is addressed in a separate memorandum opinion issued this date.

different discount categories: regular discount; quantity discount; aggregate discounts; prompt payment; FOB point; and other, that it offers to private hospitals, educational institutions, governments, original equipment manufacturers, and buying groups. *Id.*, ¶ 4.c.

Thomas alleges that SMS made false representations in its DPI in response to VA solicitations for medical equipment contracts when it omitted greater discounts it had given non-governmental customers. He cites four instances where SMS gave larger discounts on CT scanners, MRI systems, ultrasound equipment and nuclear imaging systems to Broadlane, a hospital group purchasing organization, than it gave the VA. He contends that because the government was led to believe that the discounts listed on the DPI were the best SMS had given its other customers, the government accepted lower discounts from SMS than it would have had it known about the discounts given to Broadlane. As a result, the government paid more than it would have for that equipment.

In support of his contention, Thomas alleges that the defendants engaged in a pattern of undercutting government pricing. He claims that SMS assured Broadlane that it was receiving a greater discount than the government was. He saw a chart summarizing discounts given in 2005 which revealed that discounts to private customers on average exceeded those given to the government. Additionally, an SMS senior vice president announced that SMS had "significant exposure" because discounts given to private customers often exceeded those given to the government. After it acquired Acuson, a group purchasing organization, SMS continued a scheme, known as "Y Code," that utilized pretextual codes in its sales data to justify "lower-than-government" prices. Discount quotes were often back-dated to include an after-the-fact "Y Code." In short, according to Thomas, the "Y Code" served to obscure higher discounts given to private customers,

resulting in higher prices to the government.

Central to its Rule 12(b)(6) challenge is the distinction SMS creates between "contractual" and "transactional" discounts. It argues that Thomas's claims relate to transactional discounts. It contends that all that is required to be disclosed are "contract discounts," not "transactional discounts." Thus, it argues that because it disclosed all contract discounts, it cannot be liable.

Thomas draws no distinction between contractual and transactional discounts. He contends that a vendor is required to disclose its best discounts, both contractual and transactional.

SMS contends that it is required to disclose on the DPI only the best "contract discounts" it gave to private customers, and that is exactly what it disclosed. It begins its explanation with its interpretation of the FAR. According to SMS, the FAR establishes a two-tiered regime for government purchasing of capital medical equipment. At the qualifying stage, the government solicits offers from multiple contractors at negotiated baseline prices. Those whose bids are accepted are placed on a list of qualified vendors. At the transactional stage, the government purchases from a vendor or vendors on the qualified list at a price that is then negotiated based on volume and other terms. This "transactional discount" is often significantly greater than the previously established "contract discount." SMS contends that the FAR calls for the establishment of set per-unit prices at the inception of a contract, and that these prices are "ceiling" prices subject to downward negotiation. 48 C.F.R. §§ 16.201, 16.504(a). In other words, the placing of a vendor on a qualified contractors list does not necessarily result in government sales, but rather entitles a contractor to compete with other qualified vendors for sales at the

subsequently requested configurations and volume. Thus, SMS argues, contracts to sell medical equipment to the government are distinct from actual transactions for the sale of medical equipment under those contracts, which are negotiated if and when a government facility decides to purchase the equipment.

In addition, when contracting for medical equipment, the contracting officer must establish "price reasonableness" or a "fair and reasonable price." 48 C.F.R. §§ 12.209, 13.106-3, 15.402(a). To do this, he may seek information other than the vendor's catalog price list, such as: the discount price information on the DPI; comparison of proposed prices for the same or similar items offered by other contractors, both in the current solicitation and in previous ones; or, call upon an audit office to conduct an audit to assist in determining price reasonableness. 48 C.F.R. §§ 15.403-3(a)(1), (c);15.404-1(b)(2), (3); § 15.404-2(c).

According to SMS, the Office of Inspector General of the VA conducted a pre-award audit with respect to the CT and MRI scanner contract solicitations.[3] SMS provided the auditors pricing and discount data for sales made to non-governmental customers the prior year, which included both contract and transactional discounts. The government made a chart of the SMS data, reflecting that the discounts SMS gave on individual transactions were far greater than those given on contract discounts. SMS contends that these contract discounts are the ones it had identified on the DPI for the CT and MRI solicitations. The government, after considering the audit results, awarded SMS the CT/MRI equipment contract at the same contract discount levels that SMS had initially offered. SMS contends

---

[3] There was no audit regarding the nuclear medicine and ultrasound equipment contracts.

that the transactional discounts on the chart are precisely the information that Thomas claims SMS concealed from the government on its DPI. From this contention, which Thomas disputes, SMS concludes that the government's award of the CT/MRI contract at the same rate as before the transactional discounts were disclosed shows that SMS was not obligated to have disclosed any additional information on its DPI.

## Legal Standards

When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), all well-pleaded allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiffs. *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), giving the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Although this standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). There must be enough factual content from which the court can draw a reasonable inference that the defendant is liable. The claim for relief must be "plausible on its face." *Twombly*, 550 U.S. at 570. To reach this point in the analysis, a court must consider only those legal conclusions that are supported by factual allegations and disregard those that are not.

In FCA cases, the particularity requirement imposed by Fed. R. Civ. P. 9(b) applies. *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004). Rule 9(b) requires that in "alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).[4] To comply with the requirements of Rule 9(b), a complaint must state "the date, place or time of the fraud," or otherwise inject "precision or some measure of substantiation into [the] allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). Rule 9(b) requires a plaintiff to identify the source of the allegedly fraudulent misrepresentation or omission. *See Klein v. General Nutrition Cos., Inc.*, 186 F.3d 338, 345 (3d Cir. 1999).

## False Statements

The FCA covers all fraudulent attempts to cause the government to pay money. *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 183 (3d Cir. 2001) (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)). To state a claim under the FCA, the relator must allege that the defendant made or submitted a materially false statement or claim to the government. *Harrison v. Westinghouse Savannah River Co.* ("*Harrison I*"), 176 F.3d 776, 785, 788, 792-94 (4th Cir. 1999).

In its challenge under Rule 12(b)(6), SMS asserts that Thomas's false statement claim under 31 U.S.C. § 3729(a)(2)[5] should be dismissed because its statements were not knowingly false, material or required by the government when it awarded the contracts at issue.[6] It contends that there were no false statements because there was no omission

---

[4] In contrast, the second sentence of Rule 9(b) states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

[5] Section 3729(a)(2) provides liability for "knowingly mak[ing] . . . a false record or statement to get a false or fraudulent claim paid or approved by the government." § 3729(a)(2).

[6] In May 2009, Congress passed the Fraud Enforcement Recovery Act, Pub. L. No. 111-21, 123 Stat. 1617 (2009) ("FERA"), which amended the FCA. FERA re-designated § 3729(a)(1) as 3729(a)(1)(A); § 3729(a)(2) as 3729(a)(1)(B); and § 3729(a)(7) as 3729(a)(1)(G). Thomas contends that the amended version of § 3729(a)(2), which is now § 3729(a)(1)(B), and provides liability for "knowingly making a false record or

of required information. In other words, it argues that the information that Thomas claims was not disclosed was not required. Specifically, according to SMS, the FAR did not require that the DPI contain information regarding transactional discounts, only contractual discounts.

SMS's arguments are based on factual assertions that require resolution by the fact finder. In responding to the motion to dismiss, Thomas disputes the factual basis for SMS's arguments. First, without knowing what the government required and considered in awarding the contracts, one is unable to conclude at this stage that SMS had no duty under the FAR to disclose transactional discounts. A plain reading of the DPI suggests that transactional discounts are not excluded from the calculus. The bidder must disclose its "best discount," not just its best "contractual discount." Nor do 48 C.F.R. §§ 15.404-1 (b)(2)(i)-(ii) and (b)(3) support the proposition that the FAR contemplates the comparison of only contract discounts. Those provisions state that comparing previous commercial "contract prices" with current proposed prices is an example of a technique for analyzing price to ensure a "fair and reasonable" price.

SMS cannot rely on *United States v. Data Translation, Inc.*, 984 F.2d 1256 (1st Cir. 1992). That case was decided after a jury trial where there had been evidence from a GSA expert about what the discount disclosure language required, and testimony that the government's negotiator had told the defendant's representative prior to the disclosures what information he did and did not want. Contrary to SMS's argument, the First Circuit did not hold that transactional pricing was never required. Rather, it held that the form

_____

statement material to a false or fraudulent claim," applies retroactively to this case. Based on the plain meaning of § 4(f) of the FERA, § 3729(a)(1)(B) does not apply retroactively.

called for disclosure of significantly relevant price discounts that the defendant normally provided to other customers making roughly comparable purchases to those the government contemplated making. The terms "significant," "relevant," "normally provided to others," and "roughly comparable purchases" are relative, requiring factual determinations in the context of the case.

Finally, the fact that the government awarded SMS the CT/MRI contract with the same discount terms as those SMS had offered before the audit does not absolve SMS of the duty to disclose transactional discounts. There are many possible reasons the government might have awarded the contract on the same terms. Additionally, the fact that higher discounts were disclosed later upon request of the government does not excuse SMS for making the original allegedly false disclosure.

Even if SMS had no duty to provide the government with transactional discount information, there remains a basis for a cause of action as alleged. Thomas contends that SMS provided the government with false information on the best contract discounts it had with other customers at the time they submitted their DPI.

### Materiality

SMS also argues that Thomas has failed to allege facts showing that the government relied on the missing information and, therefore, the information could not have been material. Put another way, they contend that there are insufficient alleged facts showing that had the government known about the transactional discounts, the result would have been any different. In fact, they argue the government knew about SMS's transactional discounts from its pre-award audit of the transactional discounts and still awarded the contracts.

Like the issue of falsity, the question of materiality requires a factual determination that cannot be made now. A statement or claim is material if it has a "natural tendency to influence or was capable of influencing the government's funding decision." *See, e.g.*, *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 446 (6th Cir. 2005); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003). On its face, the DPI request for best discounts provided to other customers is material because it enables the government to use the information to negotiate a "fair and reasonable" price. Why would the government ask for this information if it was not material to its decision?

In addition, even assuming the government obtained and relied on the transactional discount disclosures in the audit relating to the CT/MRI contract solicitation, the fact that it awarded the contract with the same discount terms as SMS made in its original offer does not mean the original omission had not influenced the government's decision. For example, the government may have awarded the CT/MRI contract on the same terms as the initial offer even if it believed SMS submitted a false DPI initially because it determined that despite the false submission, it would benefit from the contract as is and needed the equipment at that time without committing resources to investigate the fraud. At the pleading stage, one cannot discern the government's motivation and its process.

## Knowledge

SMS also argues that Thomas has alleged no facts from which one could reasonably infer that SMS knew or believed that transactional documents needed to be disclosed. It also argues that it could not have known it was making a false statement in its DPI because the *Data Translation* case announced, more than ten years earlier, that

the DPI did not require disclosure of special and volume transactional discounts.

Contrary to SMS's characterization, Thomas has not limited his allegations to the failure to disclose transactional discounts. He has alleged numerous facts which, if established, prove knowledge. He has alleged that SMS devised a scheme to hide higher discounts given to private customers and to backdate quotes, and that its managers admitted it was frequently not giving the government the best discount.

Thomas has made out a claim under § 3729(a)(2). He has alleged that SMS made false disclosures to the government regarding discounts it gave to other customers, that SMS knew it was required to disclose these discounts and that the false disclosures were material to the government's decision to enter into the equipment contracts with SMS. Therefore, he has alleged the elements of a false statement claim under § 3729(a)(2).[7]

### Reverse False Claims

Thomas also asserts a claim under § 3729(a)(7), known as a "reverse false claim," which holds a defendant liable who knowingly makes a false record or statement to conceal, avoid, or decrease an obligation to pay the government. A reverse false claim is aimed at fraudulently reducing a liability owed to the government and not to get a false claim allowed or paid. *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, 473 F.3d 506, 514 n.12 (3d Cir. 2007). Under this provision, the plaintiff must allege that the defendant did not refund money or property that it was obligated to return to the government. *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 444 (3d Cir.

---

[7] With respect to his claim under § 3729(a)(1), which holds a defendant liable who knowingly presents a false claim for payment or approval to the government, SMS argues that Thomas fails to state a claim under this theory of FCA liability. Because it makes virtually identical arguments to those regarding his claim under § 3729(a)(2), which we have rejected, Thomas has stated a claim under § 3729(a)(1).

2004).  In addition, there must be a "clear" obligation or liability to the government.  *Id.* at 445, 446.

Thomas appears to be making two arguments in support of liability under the reverse false claim provision.  First, he argues that SMS demanded payment based on a fraudulently induced contract each time it requested payment.  Consequently, each invoice was inflated, imposing an affirmative obligation on SMS to refund payments it improperly received from the government.  Because SMS did not refund the payments, it avoided or decreased its obligation to the government.  Second, Thomas maintains that SMS failed to comply with its affirmative obligation under 48 C.F.R. § 552.238 to disclose to the government subsequent price reductions it offered to other customers after the government had awarded it contracts and to offer the government a price adjustment.

Thomas is essentially alleging that SMS failed to refund the false claims that the government paid.  He is merely recasting his false statement claim under § 3729(a)(2).

Congress enacted the 1986 amendments to the FCA to "enhance the [g]overnment's ability to recover losses sustained as a result of fraud against the [g]overnment."  *See* False Claims Amendments Act of 1986, S. Rep. No. 99-345, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 5266.  Prior to the 1986 Amendments, courts did not agree that the FCA covered reverse false claims.  The addition of subsection (a)(7) codified the principle that a "reverse false claim" was actionable.  S. Rep. No. 99-345, at 15, 18 (1986), reprinted in 1986 U.S.C.C.A.N. 5266 at 5280, 5283 (stating "recent court rulings ha[ve] produced an ambiguity as to whether . . . 'reverse false claims' [are] covered by the False Claims Act . . .").  Thus, Congress' purpose in enacting subsection (a)(7) was to ensure that one who makes a false statement in order to avoid paying money owed the

government "would be equally liable under the Act as if he had submitted a false claim to receive money." *Id.* Its purpose was not to provide a redundant basis to state a false statement claim under subsection (a)(2). *See also United States ex rel. Taylor v. Gabelli*, 345 F.Supp.2d 313, 338-39 and n.142 (S.D.N.Y. 2004) (in context of public bidding procedure for wireless telecommunications licenses where the plaintiff alleged the defendants falsely certified they were eligible for federal discounts in violation of subsections (a)(1) and (2) by inducing the government to pay them in bidding credits, plaintiff was not permitted to assert that the same false certification violated (a)(7) by reducing their pre-existing duty to pay for the licenses because the reduction in money owed to the government was the very same money that the defendants would procure from the government.).

Because Thomas is using subsection (a)(7) to make a redundant false statement claim under subsection (a)(2), and because he has not alleged the existence of a "clear" obligation or liability to the government that SMS failed to pay, he has not stated a "reverse false claim" under § 3729(a)(7).[8]

## Claims Regarding Seventeen Other Contracts

SMS also argues that references to seventeen contracts listed as an exhibit to the second amended complaint cannot constitute false claims under the FCA because Thomas failed to allege with any particularity a single false statement in any one of the contracts. The second amended complaint does not aver whether these contracts were for the

---

[8] In his second amended complaint, Thomas alleged that the defendants conspired to defraud the government by getting a false or fraudulent claim allowed or paid, in violation of § 3729(a)(3). Second Amended Compl., ¶ 66(b). Because Thomas did not address defendants' argument that he failed to allege an actionable claim of conspiracy, he appears to have abandoned this theory of liability. In any event, his failure to respond to the argument renders it uncontested. *See* Local Rule of Civil Procedure 7.1(c).

purchase of medical equipment, were negotiated by the same employees who negotiated the other four contracts, contained DPI, or were negotiated with the required scienter.

To excuse the lack of content and particularity, Thomas argues that because SMS misrepresented discounts with respect to the four contracts he does specify, it must have made similar misrepresentations in securing each of the contracts listed in the exhibit. This is nothing more than conjecture. It is simply a baseless assumption unsupported by factual allegations. Thus, Thomas has failed to state with particularity the nature of any false claim or statement made in those contracts listed in the exhibit.

**Claim Against Siemens Corporation**

Siemens Corporation argues that claims against it fail as a matter of law because Thomas does not allege that Siemens Corporation participated in the contract process and does not distinguish among the defendants. Nor does he assert a claim for vicarious liability based on a piercing the corporate veil or an agency liability theory.

In response, going beyond the allegations in the second amended complaint, Thomas contends that Siemens Corporation played a "meaningful role" in SMS's submission of false statements by "overseeing and facilitating the fraud that SMS perpetuated." Specifically, he states that SMS put Siemens Corporation's taxpayer identification number on all of its VA solicitation responses, Siemens Corporation advertised that it is responsible for all U.S. legal and regulatory activities involving compliance for Siemens Companies, and Siemens Corporation promoted cross-selling among various Siemens operating companies.[9]

---

[9] *See* Pl.'s Br. (Doc. No. 41) at 31-32.

Neither the allegations in the second amended complaint nor the new contentions in his response to the motion to dismiss state a viable cause of action against Siemens Corporation. The second amended complaint only asserts that Siemens Corporation is the parent company of SMS, which it controls. It contains no facts about Siemens Corporation's actual involvement in the alleged fraud. The new facts raised in Thomas's response, that Siemens Corporation promoted cross-selling among and was responsible for regulatory compliance of Siemens companies, and that its taxpayer identification number appeared on the solicitation responses, similarly fail to establish that Siemens Corporation took part in the contracting process. In short, there are insufficient facts alleged that could, if proven, demonstrate that Siemens Corporation played any role, direct or indirect, in making the alleged false statements.[10]

## Siemens AG's Motion to Dismiss

### Lack of Service

Before considering the adequacy of the allegations against Siemens AG for purposes of deciding the Rule 12(b)(6) challenge, we must address Siemens AG's motion under Fed. R. Civ. P. 12(b)(5) raising insufficient service of process. A court has no jurisdiction over a defendant who has not been properly served. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) ("In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power

---

[10] Thomas has moved to amend his complaint a third time. With respect to Siemens Corporation, he requests leave to plead the same allegations that he asserted for the first time in his response to the motion to dismiss. *See* Relator's Mot. for Leave to File Amended Compl. (Doc. No. 46). His motion for leave to amend is addressed in a separate memorandum opinion issued this date, in which we conclude that the allegations about Siemens Corporation in the proposed third amended complaint do not cure the deficiencies in stating a cause of action against Siemens Corporation.

over a party the complaint names as defendant.") (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)); *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946). Therefore, unless Siemens AG was properly served, there is no jurisdiction over it, and the action may not proceed against it. *Lampe v. Xouth, Inc.*, 952 F.2d 697, 700-01 (3d Cir. 1991).

When a defendant has not been properly served, the court may dismiss the complaint without prejudice. *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992). However, when there is a "reasonable prospect" that service may be obtained, dismissal of the complaint is "inappropriate." *Id.*

On October 7, 2008, Thomas was granted leave to file his second amended complaint[11] and to serve the defendants by February 2, 2009.[12] Shortly before the deadline, on January 26, 2009, Thomas filed a "Motion for [a Six-Month] Extention [sic] of Time to Serve Defendant Siemens AG Thru the Hague Convention." In that motion, he asserted that the "Hague Convention is the exclusive means of service upon Siemens AG, a German company," and it might take several months to complete the "lengthy" and "bureaucratic process of service" on Siemens AG in Germany.[13] As requested, Thomas was given six months, or until August 2, 2009, to serve Siemens AG in compliance with the Hague Convention.[14]

---

[11] Before this action was transferred to this district, Thomas filed his original complaint under seal on September 2, 2004, in the District Court of the Virgin Islands, Civil Action No. 2004-116. He filed his first amended complaint, also under seal, on August 18, 2006.

[12] Virgin Islands ("V.I.") Doc. Nos. 27, 28.

[13] V.I. Doc. No. 29, ¶¶ 5, 7.

[14] V.I. Doc. No. 30.

In his second amended complaint filed on January 29, 2009, Thomas stated that "[s]ince Siemens AG [, a German corporation,] does not maintain a registered agent as required, it must be served under the exclusive provisions of the Hague Convention, and Relator is complying with these obligations."[15]

Thomas first attempted to serve Siemens AG in February of 2009, almost four months after he was granted leave to serve the defendants. Through a process server, he sent Germany's designee for service of process requests from overseas in the State of Bavaria, via FedEx, a copy of the second amended complaint. The second amended complaint was translated into German, but the incorporated 422 pages of exhibits were not. The German authorities refused the attempted service because the exhibits had not been translated as required.[16]

Twenty-five days after his attempted service failed, rather than translating the exhibits and renewing his effort to serve Siemens AG through the Hague Convention, Thomas changed the position he had taken with the court, contending now that he "reconsidered his prior position that the Hague Convention was the exclusive method of service on Siemens AG." He then sought to characterize Siemens Corporation and SMS as agents of Siemens AG for purposes of service of process. On July 10, 2009, he delivered a summons and the second amended complaint directed to Siemens AG to Siemens Corporation.[17]

## Service Under the Hague Convention

---

[15] Second Amended Compl., ¶ 2.

[16] Pl.'s Br. (Doc. No. 43) at 8-9.

[17] *Id*. at 9.

The Federal Rules of Civil Procedure dictate the method of service of process on a foreign entity. Rule 4(h) requires that a foreign corporation, from whom a waiver of service has not been obtained, must be served "in any manner prescribed by Rule 4(f)." Fed. R. Civ. P. 4(h)(2). Rule 4(f) provides that a foreign corporation may be served "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1); *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (1969) ("Hague Convention").[18] Both the United States and Germany are signatories to the Hague Convention. Accordingly, as Thomas had correctly asserted in his motion for an extension of time to serve Siemens AG, service upon a German citizen must be made in compliance with the requirements of the Hague Convention. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988) ("compliance with the [Hague] Convention is mandatory in all cases to which it applies").

The Hague Convention "shall apply in all . . . civil or commercial matters [ ] where there is occasion to transmit a judicial or extrajudicial document for service abroad." *See* Hague Convention, art. 1. It provides for service in the following manner. First, the plaintiff, through a "requesting authority," must send a request to make service to the agency designated by each signatory to the treaty as the Central Authority to accept such

---

[18] The Hague Convention is a multilateral treaty that was formulated in 1964 by the Tenth Session of the Hague Conference of Private International Law. *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988) (citations omitted). The objectives of the Conference were to "provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Id.*

requests. *Id.*, arts. 2, 3. The request must conform with the model annexed to the Hague Convention, and must include copies of the documents to be served. *Id.*, art. 3. If the Central Authority "considers that the request does not comply with the provisions of the present Convention [,] it shall promptly inform the applicant and specify its objections to the request." *Id.*, art. 4. Otherwise, the Central Authority must effect service on the individual named by the method indicated in the request. *Id.*, art. 5.

Although the request may be written in either English, French or the official language of the originating State, the "Central Authority may require the document [to be served] to be written in, or translated into, the official language or one of the official languages of the State addressed." *Id.*, arts. 5, 7. Germany has such a requirement.[19]

Thomas failed to comply with the service requirements mandated by the Hague Convention. After his initial attempt failed, he only had to translate the exhibits before serving Siemens AG through the Central Authority. He inexplicably never renewed his effort to effectuate proper service upon Siemens AG in Germany.[20]

Instead of requesting more time to serve Siemens AG, Thomas now takes a position that he served the German defendant through an alternative method of service - one he had previously claimed was not available. He argues that Siemens Corporation and SMS

---

[19] Whether a signatory requires translation into its official language is found in each country's declarations made in connection with enacting the Hague Convention. *See* Hague Conference on Private International Law, Germany, Central Authority and Practical Information, Translation Requirements, http://www.hcch.net/index_en.php?act=authorities.details&aid=257 (last visited April 22, 2010) ("Formal Service (paragraph 1 of Article 5 of the Convention) shall be permissible only if the document to be served is written in, or translated into, the German language.").

[20] The United States has the same translation requirement as Germany. *See* Hague Conference on Private International Law, United States, Central Authority and Practical Information, Translation Requirements, http://www.hcch.net/index_en.php?act=authorities.details&aid=279 (last visited April 22, 2010). Thus, if a German plaintiff attempted to serve a complaint written in German on a United States citizen, it would be rejected.

should be deemed Siemens AG's agents for service of process purposes, making service on either Siemens Corporation or SMS service on Siemens AG.  Relying on both *Schlunk* and Fed. R. Civ. P. 4(h)(1)(B), Thomas contends that because Siemens Corporation is Siemens AG's agent for service of process the delivery of a summons and a complaint to Siemens Corporation's agent for service of process, CT Corporation, was effective service on Siemens AG.

In *Schlunk*, the Court held that service under the Hague Convention was not required where Illinois law allowed service on the foreign defendant through its domestic subsidiary.  *Id.*, 486 U.S. at 707-08.  The lower court had found that the parent and subsidiary corporations were "so closely related" that the domestic subsidiary was the agent for service of process as a matter of Illinois law.  *Id.* at 697.  The defendant had not appealed that finding.  *Id.* at 706.

In this case, in contrast, Thomas has not made a showing that Siemens AG and its domestic subsidiaries are so "closely related" that service upon one can constitute service on the other.  Nor has he invoked any state law governing service of process on foreign corporations.

Under Rule 4(h)(1)(B), service of process can be effected on a foreign corporation through delivery of the summons and the complaint to "an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process. . . ."  Fed. R. Civ. P. 4(h)(1)(B).  In order for service of process upon an agent to be effective, the agent must have been actually appointed by the defendant for the specific purpose of receiving process, *United States v. Marple Community Record, Inc.*, 335 F.Supp. 95, 101 (E.D. Pa. 1971) (citation omitted), or authorized by state or federal statute.

Mere delivery of process to, or receipt of process by, a purported agent of the party to be served is insufficient to demonstrate an agency relationship for purpose of service of process. *Id.* at 102.[21] Additionally, the parent-subsidiary relationship alone does not establish agency, making service on one service on the other if the two maintain separate identities. *Lasky v. Continental Products Corp.*, 97 F.R.D. 716 (E.D. Pa. 1983); 4 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1104, n. 10 (3d ed. 2010).

The party asserting the validity of service has the burden of proving the sufficiency of service. *State Farm Mut., Auto. Ins. Co. v. Tz'doko V'Chesed of Klausenberg*, 543 F.Supp.2d 424, 428 (E.D. Pa. 2008) (citing *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993)). Consequently, he must establish that the "agent" had either express or implied authority to accept service and bind the principal. *Hemmerich Indus. v. Moss Brown & Co.*, 114 F.R.D. 31, 32 (E.D. Pa. 1987). Thomas has submitted no evidence that CT Corporation, which was Siemens Corporation's agent for service, was actually appointed by Siemens AG for the specific purpose of receiving process. Instead, he contends that agency can be established by showing that the domestic subsidiary "performs a function that the parent would otherwise have to perform" and which is "vital to the survival and success of the parent corporation."[22] He argues that Siemens Corporation and SMS should be deemed Siemens AG's agents for service of process purposes because these parties "perform functions that Siemens AG would

---

[21] Indeed, even a claim by a person receiving service of process that he is an authorized agent to accept service does not, without more, confer authority on that person to act as an agent to receive process. 1 James Wm. Moore et al., *Moore's Federal Practice*, § 4.53[2][c] (3d ed. 2009). The authority can only come from the principal.

[22] Pl.'s Br. (Doc. No. 43) at 11, 14.

otherwise have to perform" which are vital to its survival or success.[23]  His efforts fall short

of establishing the necessary functional relationship.  In factual support of his contention,

Thomas cites brochures advertising that Siemens Corporation is responsible for all U.S.

legal and regulatory activities involving compliance for Siemens companies, and that it

develops marketing and communications policies and practices in public relations,

advertising and corporate responsibility among Siemens companies.  Regarding SMS,

Thomas asserts that it is a wholly-owned subsidiary of both Siemens Corporation and

Siemens AG, acts as Siemens AG's sales agent in the United States in general, and was

the sales agent in the transactions at issue.  He also states that SMS is a "part of" Siemens

AG's Medical Solutions operating group ("MED"), and is responsible for developing, selling

and servicing Siemens AG's medical equipment.  He argues that Siemens AG would have

to either sell its products directly or form a new subsidiary if SMS did not exist.[24]  Notably,

Thomas changes his position regarding which company manufactured the medical

equipment.  In the second amended complaint, he alleged that SMS was the manufacturer

and the seller.  In his opposition to Siemens AG's motion to dismiss, he asserts that

Siemens AG and Siemens AG's MED manufactured the equipment, which SMS then

sold.[25]

Assuming without deciding that the standard for determining agency for service

purposes is whether the domestic subsidiary "performs functions that the parent would

otherwise have to perform," we conclude that Thomas has still failed to show that Siemens

---

[23] *Id.* at 11-12.

[24] *Id.* at 17.

[25] *See* Second Amended Compl., ¶¶ 4, 14, 55; Pl.'s Br. (Doc. No. 43) at 1-2, 6, 17.

Corporation or SMS meet that standard. With respect to Siemens Corporation, Thomas has not proffered enough facts to show that it performs functions that Siemens AG would otherwise have to perform which are vital to Siemens AG's survival and success, or that another subsidiary could not also perform. Regarding SMS, Thomas argues that it was acting as Siemens AG's sales agent, but he has not alleged facts showing that it was negotiating the sales of the medical equipment on behalf of anyone other than itself. He does not allege that Siemens AG made any statements or gave any direction to SMS about the equipment's pricing or the preparation of bids.

Because Thomas has not submitted any evidence that he served an authorized agent of Siemens AG, he has not complied with the service requirements of Rule 4(h)(1)(B).[26]

Even if Siemens AG could be served through Siemens Corporation's agent for service, the attempt was too late. To be timely under Fed. R. Civ. P. 4(m), a plaintiff must serve a defendant within 120 days of the filing of the complaint.[27] *McCurdy v. American*

---

[26] There is no doubt that Thomas significantly changed his position taken earlier in this litigation, now asserting that the Hague Convention is not the exclusive means of service of process on Siemens AG. Given the bases for our ruling that service was not made, we need not apply the doctrine of judicial estoppel. *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 517-18 (3d Cir. 2005) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)) (the doctrine seeks to protect the integrity of the judicial process by preventing parties from "deliberately changing positions according to the exigencies of the moment"); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 377 (3d Cir. 2007) (judicial estoppel prevents a party from "playing fast and loose with the courts" in assuming inconsistent positions).

[27] Rule 4(m) states:

**Time Limit for Service.** If a defendant is not served within 120 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

*Bd. of Plastic Surgery*, 157 F.3d 191, 194, 196 (3d Cir. 1998). In deciding whether to grant an extension of time to serve under Rule 4(m), the district court must determine whether good cause exists for the failure to have effected service in a timely manner. If good cause exists, the court must grant an extension of time for service. *McCurdy*, 157 F.3d at 196. Even absent a showing of good cause, the court must still consider whether to grant a discretionary extension of time. *MCI Telecomm. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097-98 (3d Cir. 1995).

In determining the existence of good cause, three factors are considered: (1) whether the plaintiff made a reasonable effort to serve the defendant; (2) whether the plaintiff moved for an enlargement of time to serve; and (3) whether the defendant is prejudiced by the lack of timely service. *See MCI Telecomm.*, 71 F.3d at 1097. The "primary focus is on the plaintiff's reasons for not complying with the time limit in the first place." *Id.* Moreover, the "absence of prejudice alone can never constitute good cause to excuse late service." *Id.* Otherwise, a time limit would be superfluous and meaningless.

Thomas has not shown good cause for failing to serve Siemens AG within 120 days of filing the second amended complaint, as required by Rule 4(m). Thomas requested his first extension of time to serve Siemens AG on October 3, 2008, when he asked the court for 120 days to file a second amended complaint and to serve it on all three defendants. Just seven days before the February 2, 2009 deadline, and the second amended complaint still not having been filed, Thomas sought an additional 180 days, or until August 2, 2009, to serve the second amended complaint on Siemens AG pursuant to the requirements of the Hague Convention, citing the "lengthy" and "bureaucratic process of service" in Germany. He offers no excuse for not having attempted to serve Siemens AG four months

earlier when he filed his first request for a 120-day extension of time. Nor does he explain why he did not comply with the requirements of the Hague Convention.

When service on Siemens AG failed in June of 2009, he "reconsidered his prior position that the Hague Convention was the exclusive method of service on Siemens AG," and decided that Siemens Corporation could be deemed its agent for service of process. Without asking the court for an extension of time to serve Siemens AG domestically, Thomas issued a summons and the second amended complaint directed to Siemens AG "c/o Siemens Corporation," which were delivered to Siemens Corporation on July 10, 2009. This attempted service was untimely because Rule 4(m) requires service of the complaint within 120 days of its filing. That period expired on May 29, 2009. Although Thomas was given until August 2, 2009 to serve Siemens AG through the Hague Convention protocol, he was not granted leave to serve it domestically after February 2, 2009. Thus, the attempted service on Siemens AG through Siemens Corporation's agent for service on July 10, 2009 was not timely.

In short, Thomas offers no reason, let alone good cause, for his failure to timely serve Siemens AG. He has not demonstrated that he made a reasonable effort to serve Siemens AG using means required by the Hague Convention, and he did not ask for an additional extension of time to serve it domestically. Although Siemens AG does not identify how it has been prejudiced by the delay in service, the absence of prejudice is outweighed by Thomas's lack of reasonableness in attempting to timely serve Siemens AG. Thus, we find that Thomas has not shown good cause for his failure to serve process in a timely manner.

With respect to a discretionary extension of time to serve Siemens AG, the analysis

is guided by the Advisory Committee's notes to Rule 4(m). *Petrucelli v. Bohringer &*
*Ratzinger*, 46 F.3d 1298, 1305-06 (3d Cir.1995); see also Fed. R. Civ. P. 4(m) advisory
committee's notes. The factors suggested by the committee are: the running of the statute
of limitations; attempts by the defendant to evade service; whether service was to be made
on multiple defendants; and whether the plaintiff is appearing *pro se*.[28] None of these
factors applies here. This is not a case where the defendant evaded service or concealed
a defect in attempted service. On the contrary, it is one where the plaintiff failed to comply
with the law as he represented he would.

If Thomas is not permitted to serve Siemens AG through service on Siemens
Corporation, he will still be able to pursue his claims against SMS, the only defendant
against whom he has sufficiently stated a cause of action. Thus, in weighing the
considerations set forth in the Advisory Committee's notes to Rule 4(m), we decline to
grant a discretionary extension of time.

With respect to whether Thomas should be granted an extension of time to serve
Siemens AG in Germany pursuant to the Hague Convention, the last sentence of Rule
4(m) exempts service occurring in a foreign country from the rule's general 120-day time
limit. Courts have reasoned that the foreign country exception is a recognition that the
timeliness of foreign service is often out of the plaintiff's control. *Allstate Ins. Co. v. Funai*
*Corp.*, 249 F.R.D. 157, 161 (M.D. Pa. 2008) (citations omitted); *Pa. Orthopedic Ass'n v.*
*Mercedes-Benz A.G.*, 160 F.R.D. 58, 61 (E.D. Pa. 1995); *Umbenhauer*, 969 F.2d at 31.

---

[28] Although the *Petrucelli* court stated that the factors listed in the advisory committee's notes "are not exhaustive," it "express[ed] no opinion as to what factors, in addition to those listed in the Advisory Committee note, a district court may consider when deciding whether to extend time for service or dismiss a case." *Petrucelli*, 46 F.3d at 1305, 1306 n. 8. Since *Petrucelli*, no Third Circuit case has indicated what any additional factors might be.

Nevertheless, although the Rule 4(m)'s 120-day time limit does not apply to service on a foreign corporation, that does not mean that the time to effectuate service is unlimited. *See Mitchell v. Theriault*, 516 F.Supp.2d 450, 458 (M.D. Pa. 2007); *Lewis v. Vollmer of America*, Civ. Action No. 05-1632, 2007 WL 1545661, at *1 (W.D. Pa. May 25, 2007); *Nylok Corp. v. Fastener World Inc.*, 396 F.3d 805, 807 (7th Cir. 2005); *Quantum Color Graphics, LLC v. Fan Ass'n Event Photo GMBH*, 185 F.Supp. 2d 897, 906 (N.D. Ill. 2002); *James v. Rutil (S.R.L.)*, No. IP 95-530-C-B/S, 1997 WL 151174, at *5 (S.D. Ind. Mar. 14, 1997); *In re Crysen/Montenay Energy Co.*, 166 B.R. 546, 553 (S.D.N.Y. 1994). Instead, courts have determined timeliness and sufficiency of service by employing a "flexible due diligence" standard, which considers the reasonableness of the plaintiff's effort and the prejudice to the defendant resulting from any delay. *See, e.g.*, *Teta v. Li*, No. Civ. A. 3:02CV2183JCH, 2005 WL 1668093, at *3-*4 (D. Conn. July 15, 2005); *Quantum Color Graphics*, 185 F.Supp.2d 897; *Yellowave Corp. v. Mana*, No. 00 CIV. 2267 SAS, 2000 WL 1508249, at *2 (S.D.N.Y. October 11, 2000); *James*, 1997 WL 151174; *In re Crysen*, 166 B.R. 546 ; *Cf. Allstate Ins. Co.*, 249 F.R.D. at 162 (finding Rule 4(m)'s exemption from the 120-day time limit for service in a foreign country does not apply where the plaintiff has not made a reasonable, good faith effort to attempt service abroad during the 120-day period).

Thomas does not dispute that he did not comply with United States-Germany treaty requirements and the Hague Convention. Nor does he request more time to effect service on Siemens AG in Germany in compliance with the Hague Convention.[29] He has made no showing of a good faith effort to serve Siemens AG properly. Therefore, we decline to

---

[29] *See* Pl.'s Br. (Doc. No. 43) at 8 n. 6 (stating that the exhibits to the complaint were not translated into German because of the cost).

conduct a *sua sponte* "flexible due diligence" inquiry to determine whether Thomas should be given additional time to serve Siemens AG in compliance with the Hague Convention.

In summary, Thomas failed to serve Siemens AG in compliance with the Hague Convention, and has neither requested more time to effect service in that manner nor shown a willingness to comply with the Convention's requirements. In addition, service on Siemens AG's domestic subsidiaries SMS and Siemens Corporation does not constitute valid service on Siemens AG because they are not its authorized agents for service of process. Even if Siemens AG could be sued through its subsidiaries, Thomas attempted to serve Siemens Corporation beyond Rule 4(m)'s 120-day time limit without good cause and is not entitled to a discretionary extension of time for service.

In light of all the circumstances, there is no reason to permit Thomas additional time to renew his efforts to properly serve Siemens AG. Nor shall we allow Thomas to circumvent treaty obligations under the Hague Convention. Because there is no "reasonable prospect" that service may be obtained on Siemens AG within a reasonable time, the complaint may be dismissed as to Siemens AG for failure to serve. *See Umbenhauer*, 969 F.2d at 30.

### Claims Against Siemens AG

Even if Siemens AG had been properly served, Thomas has failed to state a cause of action against it. In the second amended complaint, Thomas alleges that SMS made numerous false statements to the government in connection with its negotiation of contracts for the sale of medical equipment. He does not allege that Siemens AG did. In his brief in opposition to Siemens AG's motion to dismiss, but not in the second amended complaint, Thomas asserts that Siemens AG and Siemens AG's Medical Solutions

operating group ("MED") manufactured the medical equipment at issue.[30]  He argues, in his brief, that SMS was merely acting as Siemens AG's sales agent in the United States and in its dealings with the United States government.[31]

In support of his argument that SMS was Siemens AG's agent, Thomas attaches several documents that were not referenced in or appended to the second amended complaint, in which the words "Siemens" and "Siemens AG" appear.  He points to: letters, bearing the "Siemens" logo, regarding the medical equipment contracts at issue that were sent to the government and signed by SMS employees; brochures, DICOM conformance statements and "standard room layouts" regarding the medical equipment at issue that SMS submitted to the government with a cover page depicting the documents as coming from SMS, but which documents were authored by "Siemens AG, Medical Solutions" and "Siemens AG;" and emails between employees of SMS and Siemens AG's MED operating group showing that Siemens AG employees were involved in determining what technical documentation to supply to the government as part of the user manuals for the medical equipment at issue.[32]  None of these facts states or supports a theory that Siemens AG had any role in the pricing of the equipment sold to the government or the preparation of the bids.

## Conclusion

For the reasons given, the motions to dismiss the action against Siemens

---

[30] In fact, Thomas asserts in the second amended complaint that SMS was the manufacturer and the seller.  He does not explain why he now claims some other company was the manufacturer.

[31] Pl.s' Br. (Doc. No. 43) at 6.

[32] *Id.* at 7-8.

Corporation and Siemens AG will be granted. The motion of SMS will be granted in part and denied in part. The causes of action asserted under the reverse false claims provision, 31 U.S.C. § 3729(a)(7), and under the conspiracy provision, § 3729(a)(3), will be dismissed. In all other respects, SMS's motion will be denied.