**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* | : | **CIVIL ACTION** |
| **WILLIAM A. THOMAS** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SIEMENS AG,** *et al.* | : | **NO. 09-4414** |

**<u>MEMORANDUM OPINION</u>**

**Savage, J.**                                                               **January 13, 2014**

In this *qui tam* action brought under the False Claims Act ("FCA")[1] in which the government has declined to intervene, the defendant Siemens Medical Solutions USA, Inc. ("SMS") has moved for summary judgment, arguing that the relator, William Thomas ("Thomas"), cannot prevail on his claims because there is no genuine dispute as to any material fact regarding whether SMS made any knowingly false statements or omissions in obtaining the contracts at issue, or that the statements or omissions were material or induced the government to enter into the contracts with SMS. Thomas counters that there are genuine issues of material fact regarding SMS's submission of false and incomplete information submitted to the government.[2] He insists that he need not establish that the government relied upon the false statements in awarding the contracts.

---

[1] 31 U.S.C. §§ 3729-3733 (2003). In May 2009, Congress passed the Fraud Enforcement Recovery Act, Pub. L. No. 111-21, 123 Stat. 1617 (2009), which amended the FCA. The May 2009 amendments do not apply. *See United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 512 n.6 (E.D. Pa. 2010).

[2] Relator's Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Rel.'s Resp. Br.") (Doc. No. 107) at 31, 33.

In his second amended complaint,[3] Thomas contends that SMS, and its then affiliate, Acuson Corporation ("Acuson"), fraudulently induced the government to pay more than it would have paid for the purchase of capital medical equipment ("CME"). Thomas claims that SMS misled the Veterans Administration ("VA") in the contract bidding process by misrepresenting the extent of the pricing discounts given to other customers. The alleged false statements were made on Discount and Pricing Information ("DPI") forms submitted to VA that were required by federal procurement regulations known as the Federal Acquisition Regulation (the "FAR"). The discounts reported on the DPI forms are relied upon by the government in negotiating the price for goods it purchases. The government uses the discount information to obtain a "fair and reasonable price."

After briefing on the summary judgment motion was completed, the government, although it has declined to intervene in this action, submitted a Statement of Interest describing its role in the procurement of the contracts at issue. Relying on the declaration of Maureen Regan, who manages the auditors and management analysts of the Office of Contract Review ("OCR") of VA's Office of Inspector General ("VAOIG"), the government represents that VA had complete, contractually required information regarding the two contracts that had been audited.

Despite the government's unequivocal statement that it was not defrauded, Thomas has cobbled together facts that he perceives as suspicious and probative of fraud. But, he has been unable to fit them together to prove that fraud occurred. He has failed to present facts controverting the government's own admission that it had not been misled and had

---

[3] The original complaint was filed under seal on September 7, 2004, in the U.S. District Court of the Virgin Islands, Civil Action No. 2004-116. The complaint was amended twice before it was transferred to this district on August 10, 2009, when SMS's motion to transfer was granted.

not been harmed.  Thomas could have conducted discovery of the government, but chose not to do so.

After reviewing the evidence in the light most favorable to Thomas and drawing all reasonable inferences in his favor, we conclude that SMS is entitled to judgment as a matter of law.  Thomas has failed to produce sufficient evidence to present a factual issue as to whether: (1) SMS made any false statements; (2) the omissions or false disclosures were material to VA's decision to award the contracts; or (3) the government was actually misled or induced into awarding any of the contracts at issue.  Although he points to several sales transactions where a commercial customer had received a higher discount than what SMS or Acuson had apparently disclosed to VA, Thomas has not proffered evidence showing or tending to show that in each instance the disclosure of additional or accurate information would have affected VA's negotiating position and led VA to have negotiated a greater contract discount than what was actually obtained.  Therefore, because there is no evidence from which a reasonable jury could find that the government was defrauded, we shall grant SMS's motion for summary judgment.

## Background

### The Parties

SMS manufactures and sells CME, such as ultrasound systems, computed-tomography ("CT") scanners, magnetic-resonance imaging ("MR") scanners, and nuclear medicine ("NM") equipment to private hospitals and educational institutions, directly and through hospital group-purchasing organizations ("GPOs"), and to governmental agencies. Acuson, which was acquired by SMS's parent and became an independent SMS affiliate in 2000, manufactured and sold ultrasound equipment.  Acuson was merged into SMS in

2002.  Before the acquisition, SMS and Acuson had done business independently with federal, state and local governments, and commercial customers.  After becoming an affiliate of SMS and before merging into SMS, Acuson continued to administer its own contracts with the federal government.

Thomas began his career in the medical device industry at Acuson, selling cardiovascular ultrasound equipment from 1989 to 2000.  He was a marketing manager for two years before becoming a district sales specialist. After leaving Acuson in 2000, he worked at Broadlane, Inc., a GPO for hospitals and healthcare organizations.  There, as Vice President of Capital Medical Equipment Contracting Services, he provided purchasing services to groups of hospitals, clinics, outpatient centers and private healthcare offices. In early 2004, two years after Acuson had been merged into SMS, Thomas began working at SMS.  As Senior National Accounts Manager for GPO contracts, he negotiated and managed diagnostic imaging contracts with Premier, a GPO.  After notifying SMS in August of 2008 of his intention to pursue claims for violations of the FCA for its alleged unlawful pricing and discount practices with respect to the government,[4] Thomas accepted an early retirement package from SMS in October 2008.

*The Contracting Process*

The contracts at issue are direct-delivery, multiple award, fixed price, indefinite delivery/indefinite quantity ("IDIQ") contracts that were administered by VA's National

---

[4] Thomas notified SMS via a letter.  He did not serve SMS with the complaint until January 29, 2009, more than five months later.

Acquisition Center ("VANAC").[5]   In this type of contract, the price is fixed at a level negotiated below specified catalog or list prices.[6]   A vendor awarded this type of contract is guaranteed an opportunity to compete for specific sales when a government facility seeks to purchase equipment.   48 C.F.R. §§ 16.505(b), 504(a)-(c).   A multiple award contract permits a government contracting officer to award a contract to more than one vendor whose offers meet the award criteria in the contract solicitation. 48 C.F.R. §§ 16.504(c), 500.   "Fixed price" guarantees the unit prices for a certain period of time.   48 C.F.R. §§ 16.201, 202-1, 202-2.   IDIQ means that the government is not committed to buying a minimum quantity of CME from any awardee.   48 C.F.R. §§ 16.504(a), 501-1, 501-2(b)(2), 501-2(b)(3).[7]

The process for awarding direct-delivery, multiple award, fixed price, IDIQ contracts is aimed at negotiating a fair and reasonable price, not the lowest price.   After VANAC announces a solicitation for CME, vendors submit initial solicitation responses on required DPI forms.[8]   VANAC contracting officers seek additional information, sometimes by way of an audit, from the vendors.   Then, the contracting officer conducts a pricing analysis in order to make a "price-reasonableness" determination, negotiates a "fair and reasonable

---

[5] Thomas contends there are six contracts at issue, while SMS contends that only three of the six are at issue.  We address this dispute later.  In any event, all but one of the six contracts that Thomas cites were administered by VANAC.

[6] Def.'s ex. 9 (solicitation for ultrasound contract) at Bates 00214701-02; Def.'s ex. 10 (solicitation for nuclear medicine contract) at Bates 00228526; Def.'s ex. 11 (solicitation for CT/MR contract) at Bates 00286.

[7] Def.'s ex. 9 at Bates 00214703; Def.'s ex. 10 at Bates 00228529; Def.'s ex. 11 at Bates 00284; Decl. of Maureen Regan, Manager of VAOIG, Office of Contract Review ("Regan Decl.") (ex. 1 to Government's Statement of Interest) (Doc. No. 124-1), ¶ 4; Def.'s Statement of Undisputed Facts (Doc. No. 101), ¶¶ 30-36; Expert Rep. of Nancy Darr ("Darr Rep."), ¶¶ 21-27.

[8] The DPI form is Standard Form 1449, Solicitation/Contract/Order for Commercial Items.  The notice of contract award incorporates the completed SF 1449/DPI form.  48 C.F.R. § 12.204(a).

price," and ultimately awards a base, or "umbrella," contract to approved vendors. The prices agreed to in these contracts represent the "ceiling" prices for CME purchased under the umbrella contracts. Later, at the second step of the procurement process, when a VA facility needs particular CME, the awardees of the umbrella contracts are eligible to compete for the sale. At this stage, the contracting officer chooses the vendor based on a "best value" determination, that is, he selects the vendor that best meets VA's needs in terms of price and several other factors.[9] The contracting officer may negotiate a price under the "ceiling" prices set in the umbrella contract.[10]

The two levels of the process may be described as the initial "qualifying" or contract stage where the vendor qualifies to bid for future sales, and the later "transactional" stage where the vendor competes with other vendors in negotiating with VA for the sale.[11] Thus, the placing of a vendor on a qualified vendors list does not necessarily result in government sales, but only entitles that vendor to compete with other qualified vendors for sales at the subsequently requested configurations and volume.

In reviewing solicitation responses and making determinations for awarding direct delivery CME contracts, federal government contracting officers must follow the guidance

---

[9] Darr Rep., ¶¶ 30-32. Under the FAR, "best value" is defined as "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement." 48 C.F.R. § 2.101.

[10] *See* Def.'s ex. 74 (July 15, 2002 email from Lindsey of VAOIG to Sasala enclosing a chart comparing transactional discounts to contract discounts in connection with audit of SMS's response to CT and MR CME solicitation).

[11] Second Am. Compl., ¶ 19 (sales prices of CME are "typically negotiated at two different levels," where contracts are negotiated at "set prices for a particular length of time . . . under which customers are entitled to certain maximum prices . . . for certain product[s]."); Thomas Dep. at 117-22, 127; Relator's Resp. to SMS's Statement of Undisputed Facts (Doc. No. 106), ¶ 7.1 (the "'two-tier' model was applicable to SMS sales of CME to the Government as well as to GPOs and others").

and rules contained in the FAR, Title 48 of the Code of Federal Regulations, Chapter 1. To assist in obtaining a fair and reasonable price on CME from vendors, the FAR requires that the purchasing agency obtain information regarding discounts given to the vendor's other customers that result in lower net prices than those offered to the government.  The information is obtained initially from the vendor's disclosures on the DPI form, which requires the vendor to state the percentage discount from the price list that it is offering the government.  *See* DPI, ¶ 4.a.  Then, the contractor must answer whether it has:

> in effect, for any customer or any class, discounts and/or concessions, including but not limited to the following, regardless of price list, which results in lower net prices than those offered the government in this offer?

*Id.*, ¶ 4.b.

The DPI sets out, by way of example, a non-exclusive list of these discounts: "rebates of any kind"; "multiple quantity unit pricing plan"; "cumulative discounts of any type"; "products that may be combined for maximum discounts"; and "other."  *Id.*, ¶ 4.b.

In addition, the vendor must report the "best discount" from its price list that it offers to private hospitals, educational institutions, governments, original equipment manufacturers, and buying groups in six different discount categories: regular discount; quantity discount; aggregate discounts; prompt payment; FOB point; and other.  *Id.*, ¶ 4.c.

The form contains no instructions on how to complete it.  Nor does it define the terms it uses.  It does not specify whether the government is seeking information regarding contract-level or transaction-level discounts.[12]

---

[12] As explained above, sales prices of CME can be negotiated at two different levels: at the contract level where ceiling prices are fixed, and at the transaction level, where VA may negotiate a price under the "ceiling" prices at the time of purchase.  As discussed later, SMS argues that the distinction between contract-level and transaction-level discounts is important because VA accepted multiple interpretations of the

The contracting officer is not required to obtain the best price the vendor offers any other customer.   Nonetheless, when determining "price reasonableness" or a "fair and reasonable price" in negotiating these type of contracts, the contracting officer wants to know the discounts vendors are offering their commercial customers who have comparable contractual arrangements.   At the same time, the contracting officer knows that the government does not enter contracts under the same terms and conditions that commercial customers do.   For example, the government does not commit to purchase from a single vendor or for a minimum volume or quantity. Additionally, the government has an opportunity to get a greater discount at the second or transactional stage.   Furthermore, it is more costly to prepare and submit a proposal, and negotiate and administer a contract with the government than with a private-sector customer.[13]

In making a price reasonableness determination, the contracting officer considers information other than the vendor's catalog/price list.   He or she also takes into account the discount price information on the DPI; the vendor's prior pricing; a comparison of proposed prices for the same or similar items offered by other contractors, both in the current solicitation and in previous ones; and market research.   He or she must also consider several contract-specific factors, such as speed of delivery, warranty terms, limitations of the vendor's liability, contract length, and expected quantities.   48 C.F.R. §§ 12.209, 13.106-3(a), 15.402(a).

---

disclosures required on the DPI and did not require SMS or Acuson or any other vendor to complete the DPI in any particular way.   According to SMS, disclosure of the best comparable contract discounts it gave to private customers was acceptable because there are no specific instructions on how to complete the form and how to disclose discounts.

[13] Darr Rep., ¶ 35.

If the contracting officer is unable to make a price reasonableness determination or reach his or her negotiation objectives on the basis of the vendor's DPI and the other information mentioned above, he or she must seek clarification or additional disclosures from the vendor.   48 C.F.R. § 15.403-3(a)(1).[14]   One way to obtain this additional information is for the contracting officer to request the audit office to conduct an audit as part of the price reasonableness analysis.   *Id.* § 15.404-2(a), (c).   In an audit, the VAOIG auditor thoroughly reviews the vendor's commercial discount and pricing data.   He or she can request the vendor to produce actual sales data or summaries of sales data, or examine the vendor's information on site.   Vendors are often required to provide explanations for the transactions that exceed the discount offered the government.[15]   The auditor then provides the contracting officer with a detailed report, which often includes recommended negotiation terms.

During the time period in question, VA's policy was to refer for audit responses to a solicitation for a contract estimated at a value of at least $9 million. Consequently, vendors knew that there would be an audit of the solicitation responses where the contract exceeded $9 million.  That is what happened here.  The responses to VA's solicitations in 2001 for ultrasound CME and in 2002 for CT and MR CME were audited, and SMS and Acuson had received advance notice from VANAC that their solicitation responses would

---

[14] Vendors seeking contracts for CME are exempt from the requirement of providing certified cost or pricing data, which is highly detailed data regarding the vendor's costs and margin.  *See* 48 C.F.R. §§ 15.402(a)(2),15.403-1(b), 15.403-3, 2.101.  When cost or pricing data are required, the vendor must execute a Certificate of Current Cost or Pricing Data.  *Id.* § 15.406-2.

[15] Darr Rep., ¶ 43.

be audited.[16]

The purpose of performing the price reasonableness analysis is "to develop a negotiation position that permits the contracting officer and the [vendor] an opportunity to reach agreement on a . . . price that is fair and reasonable to both the Government and the [vendor]." 48 C.F.R. § 15.405(a), (b). The contracting officer's objective is to get prices and discounts that are "comparable" to the vendor's best price.[17]

Before negotiating with the vendor, the contracting officer establishes objectives, such as price, warranty terms and quality, to assist him or her in setting the government's initial negotiation position. 48 C.F.R. § 15.406-1. To establish these objectives, the contracting officer analyzes the vendor's DPI disclosures, clarifications and supplemental submissions, and any OIG audit report. *Id.*

The contracting officer is vested with broad discretion to negotiate the terms of the contract. 48 C.F.R. § 15.405 ("[T]he contracting officer is responsible for exercising the requisite judgment needed to reach a negotiated settlement with the offeror and is solely responsible for the final price agreement."). *Id.* The ultimately agreed-upon price need not be "within the contracting officer's initial negotiation position." *Id.* After analyzing and weighing the available information regarding price and other factors, he or she makes a

---

[16] *See* Def.'s ex. 26 (Dec. 1, 2000 email from Hibbits to Les Friend and Sam Patton) (stating that VA "informed us that they will be auditing both [SMS and Acuson] in January or February" for the ultrasound solicitation); Def.'s ex. 43 (Jan. 18, 2001 pre-award review letter from VAOIG to Acuson regarding ultrasound CME solicitation response); Def.'s ex. 52 (Jan. 10, 2002 letter from VANAC to SMS, alerting SMS to opening of CT/MR solicitation and stating that "[m]ost of the expected offers will have to be submitted for a preaward audit"); Def.'s ex. 53 (Jan. 15, 2002 email from VA to SMS, Phillips and GE Corporation giving advance notice of audit of responses to CT/MR CME solicitation because value of contract award estimated to be more than $9 million); Rel.'s ex. 76 (Apr. 25, 2002 pre-award review letter from VAOIG to SMS for CT/MR CME solicitation response).

[17] Regan Decl., ¶ 5.

final determination of whether the final negotiated price is fair and reasonable to the government and the vendor, and whether to recommend that the contract be awarded. *Id.* The contracting officer must document, in a Price Negotiation Memorandum, the principal elements of the negotiated agreement, including the most significant factors upon which the prenegotiation objectives and final negotiated agreement were based, and the source and type of data used to support the price reasonableness determination. 48 C.F.R. § 15.406-3(a).

In determining "best value" at the transactional stage, VA considers each vendor's product price, past performance, product quality, availability of required features, reliability of service, compliance with technical requirements and ability to meet delivery time requirements.[18]

While many of these factors are also considered in a "price reasonableness" determination, the primary differences between the two analyses are when the particular determination is made and the type of competition the vendor faces. A "price reasonableness" determination is made at the first (qualifying) stage and sets a ceiling on prices for various CME. The "best value" determination is made later, at the second (transactional) stage when VA needs a particular item of CME. At the first stage, the contracts are awarded non-competitively to multiple vendors, and the contract prices ultimately awarded are based, in part, on information on the DPI about the vendor's commercial sales pricing.[19] Other factors considered are the vendor's catalog/price list; the

---

[18] *See* Def.'s ex. 11 (CT/MR Contract) at Bates 000293; Def.'s ex. 9 (Acuson U/S Contract) at Bates 214707; Def.'s ex. 10 (NM Contract) at Bates 228532; Darr Rep., ¶ 32.

[19] Regan Decl., ¶ 4.

vendor's prior pricing; a comparison of proposed prices for the same or similar items offered by other contractors, both in the current solicitation and in previous ones; market research; delivery terms; warranty terms; and contract length.

At the second (transactional) stage, all of the vendors who were awarded an umbrella contract compete with one another to make the actual sale to VA.  At this stage, the contracting officer knows what VA's needs are, and can select the vendor that best meets its needs in terms of price and other factors.  Because the contracting officer is now in a position to commit to purchase a certain quantity of CME in a finite amount of time, he or she can negotiate for a price lower than the contract price.

Thomas seeks to ignore the government's description of the contracting process, both generally and specifically in this case.  He contends that Regan's declaration and the government's statement of interest based on the declaration are not admissible evidence because they are documents written by lawyers with no personal knowledge of the underlying facts in this case.  He argues that the declaration is not based on personal knowledge of the specific representations, negotiations or events in this particular case. Yet, he concedes that Regan has personal knowledge about VA's general practices and negotiation objectives.[20] Further, Thomas's counsel stated at oral argument that "for the purposes of this argument for summary judgment purposes, the Regan declaration is information that I think Your Honor can include in your consideration."[21]  Despite this acknowledgment, Thomas did not depose Regan or any other official having knowledge

---

[20] Rel.'s Supp'l Mem. of Law in Opp'n to SMS's Mots. for Summ. J., to Preclude Thomas's Expert Johnson and to Disqualify Thomas as a Relator (Doc. No. 138) at 10-12.

[21] Tr. of Hr'g on Mot. for Summ. J. (Aug. 27, 2013) ("MSJ Tr.") at 35.

of the process and the contracts.

Regan's declaration is admissible.  She has the requisite personal knowledge.  Her job, both at the time the contracts at issue were audited and now, was and still is to manage the auditors who conduct pre-award reviews of contract proposals submitted to VA.  When the CT/MR and Acuson ultrasound contracts were audited, she supervised or managed the auditors of those proposals.[22]  Although the auditors must comply with the law in carrying out their job responsibilities, Regan's description of the process that the auditors must follow in all direct delivery contracts for CME is a specific, not a generic, one.  Similarly, when she describes the audit process with respect to the specific CT/MR and Acuson ultrasound audit, she refers to the actual, specific documents and reports produced in each audit.  *See* Regan Decl., ¶ 9 (referencing audit reports by date).  Therefore, her declaration was made with personal first-hand knowledge.

Thomas also argues that SMS's expert, Nancy Darr, is not qualified to offer testimony in this action.  Darr worked in healthcare contracting at VA for twenty-three years, including as a contracting officer and ultimately as Chief Operating Officer of VANAC from 1993 to 1997.[23]  She opines that the DPI is ambiguous, subject to differing interpretations, and does not specifically seek disclosure of the best transactional discounts as opposed to the best contract discounts.  Additionally, she opines that when negotiating a contract award, the VA contracting officer takes into consideration that the

---

[22] *See* Regan Decl., ¶¶ 2, 9; Rel.'s ex. 76 (Apr. 25, 2002 letter from VAOIG to SMS pertaining to the start of the CT/MR audit, with Regan's name listed as a "cc" recipient).

[23] Darr Rep., ¶¶ 1-5.  Darr was Senior VP for Contracting at Premier Purchasing Partners, a GPO, from 1997 to 2000, and, since 2000, has, as part of her own consulting business, advised contractors on preparing, negotiating, and administering contracts with VA and other government agencies.  *Id*. ¶¶ 7-8.

government does not enter contracts under the same terms and conditions as commercial customers, such as a commitment to purchase from a single vendor or for a minimum volume or quantity, and that it is more costly to submit a proposal, and negotiate and administer a contract with the government than with a private-sector customer.

Thomas contends that because Darr was no longer employed by VA at the time SMS submitted proposals for the contracts at issue and never worked with DPI forms "directly" while she was at VA, she is not qualified to testify as to any issues in this case.[24] On the contrary, because Darr has more than twenty years of experience at VA, and was head of VANAC, which entered into the contracts at issue in this case, she is competent to testify about the general process of solicitation, negotiation and award of the type of contracts in this case.  She is also competent to give her opinion about what kind of information vendors were required to disclose on the DPI, such as transactional versus contractual discounts.

### The Alleged Fraudulent Scheme

Thomas alleges that SMS was engaged in a "multi-tiered fraud."  He claims that SMS, "[c]aught in a whirlpool of increasing discount pressure by its commercial customers," developed a system to sell its CME without constantly lowering its prices by "withholding discounting and low price information from customers until absolutely forced to disclose it, only then to rationalize why the newest lowest price was not available to the inquiring customer for some fictional reason or other."[25]

---

[24] Darr Rep. ¶¶ 2-8, 35-40; Darr Dep. at 23-24, 93.

[25] Rel.'s Resp. Br. at 2-3.

Specifically with respect to the government, Thomas alleges that SMS either hid its lowest prices from the government, or, when "caught," often "justified" those prices with deceptive, after-the-fact "explanations" that were supposedly unique to the customer receiving the lower price.  When, in pre-award audits, the government attempted to "test the candor of Siemens' price disclosures," SMS produced only select data that "understated the scope and magnitude of its discounting."  Thomas further claims that "through a process of repeated delays," SMS "dragged out its compliance with Government requests" for specific pieces of information, impeding the government's ability to investigate SMS's disclosures.[26]

### The Contracts at Issue

SMS argues that the only claims remaining in this action are based on three contracts encompassing four modalities: (1) the 2001 ultrasound contract between Acuson and VA ("2001 Acuson U/S Contract")[27]; (2) the 2002 CT/MR contract between SMS and VA ("2002 CT/MR Contract");[28] and (3) the 2003 nuclear medicine imaging contract between SMS and VA ("2003 NM Contract").[29]  Pointing to the ruling dismissing claims relating to seventeen other contracts as inadequately pled, SMS contends that Thomas may not now assert new claims based on those contracts that had not been identified in the second amended complaint.

Thomas argues that there are three additional contracts at issue: (1) the 2001

---

[26] *Id.* at 3.

[27] Contract # V797P-6915a; Def.'s ex. 12.

[28] Contract # V797P-6956a; Rel.'s ex. 35.

[29] Contract # V797P-6964a; Rel.'s ex. 52.

ultrasound contract between SMS and VA ("2001 SMS U/S Contract");[30] (2) the 2002 multi-modality contract between SMS and Defense Supply Center of Philadelphia ("DSCP")("DSCP Contract");[31] and (3) the 2000 nuclear medicine imaging contract between SMS and VA ("2000 SMS NM Contract").[32]   He contends that these contracts were "repackaged under the authorization of" the three contracts that SMS agrees are at issue. Specifically, he contends the Acuson U/S Contract "novated" to SMS's U/S Contract, resulting in a "merger" of the two ultrasound contracts; and the DSCP contract was merely an extension of the first three contracts because after they expired, VA continued to purchase the same CME at the same discount rates under the DSCP contract.

What contracts are at issue is important because it determines what allegedly false statements must be examined and the scope of any damages.

*Background on the Contracts*

The three contracts the parties agree are at issue are the 2001 Acuson U/S Contract, the 2002 CT/MR Contract and the 2003 NM Contract (collectively, "agreed-upon contracts").

2001 Acuson U/S Contract

On October 23, 2000, VA issued a solicitation for ultrasound imaging equipment for the contract period from the later of April 1, 2001 or the date of the award until March 31, 2002, with the option to renew the contract for two additional one-year periods.  Priscilla

---

[30] Contract # V797P-6908a; Rel.'s ex. 47.

[31] Contract # SPO-200-02-D8314; Def.'s ex. 133.  The DSCP is the procurement arm of the United States Department of Defense.

[32] Contract # V797P-6881a; Def.'s ex. 134.

Ryland, who managed Acuson's contracts with the government for ultrasound products, submitted Acuson's DPI response to this solicitation on December 19, 2000.  VA issued a pre-award audit engagement letter on January 18, 2001.  The audit and negotiations between Acuson and VA took place between January and April of 2001. Acuson submitted an amended DPI on April 11, 2001, and the contract was awarded on May 2, 2001.  The final audit report was issued on July 10, 2001.  This contract originally expired on April 1, 2002.  By agreement, the contract was renewed twice for additional one-year periods, extending the expiration date to March 31, 2004.[33]

### 2002 CT/MR Contract

SMS submitted its DPI response to this solicitation on April 9, 2002.  VA issued a pre-award audit engagement letter on April 25, 2002.  The audit and negotiations between SMS and VA took place between April and September of 2002.  VAOIG issued a final audit report on July 25, 2002.[34]  SMS submitted a revised DPI on August 15, 2002.  The contract was awarded on September 19, 2002.  This contract originally expired on March 31, 2003. By agreement, the expiration date was extended to March 31, 2005.

### 2003 NM Contract

SMS submitted its DPI response to the solicitation in January of 2003.  The contract was awarded on April 1, 2003 without an audit.  Originally due to expire on March 31, 2004, it was extended to August 31, 2006.

---

[33] Def.'s exs. 1, 50; Regan Decl., ¶ 9; Def.'s ex. 22 at Bates 000211132 (VAOIG Semiannual Report to Congress covering Apr. 1 - Sept. 30, 2001, listing final audit report date for Acuson ultrasound solicitation as July 10, 2001).

[34] Regan Decl., ¶ 9; Def.'s ex. 22 at Bates 000211327 (VAOIG Semiannual Report to Congress covering Apr. 1 - Sept. 30, 2002, listing final audit report date for SMS CT/MR solicitation as July 25, 2002).

Thomas contends that the 2001 SMS U/S Contract, the DSCP Contract and the 2000 SMS NM Contract are at issue. SMS argues that they are not.[35] We agree with SMS and now explain why they are not at issue.

### 2001 SMS U/S Contract

SMS's DPI response to this solicitation was submitted on December 21, 2000. The contract was awarded on March 5, 2001. The contract, originally set to expire on April 1, 2002, was extended to March 31, 2004.

Thomas argues that this contract between SMS and VA is at issue because the Acuson U/S Contract – which is undisputedly at issue – was "merged" into the SMS U/S Contract. He asserts that the Acuson U/S Contract "novated" to SMS's U/S Contract after Siemens acquired Acuson and Acuson changed its name to "Siemens Medical Solutions USA, Inc."

Thomas's position is baseless. First, the acquisition of a company does not mean the acquired company's contracts automatically "merge" into the acquiring company's existing contracts. Second, it is not accurate that Acuson changed its name to Siemens.[36] The document on which Thomas relies – an October 2001 letter from Kathy Sasala[37] at SMS – states that "our company name has officially been changed from Siemens Medical

---

[35] The government agrees with SMS that the agreed-upon contracts are the only ones at issue. *See* Government's Statement of Interest (Doc. No. 124) at 3-4.

[36] Even if Acuson had changed its name to Siemens, that does not mean its prior contracts "merged" into Siemens's contracts.

[37] Sasala was a contract specialist in SMS's Government Accounts department. *See* Rel.'s Resp. Br. at 4 n.3.

Systems, Inc. to Siemens Medical Solutions USA, Inc."[38]  There is no mention of a name change from *Acuson* to Siemens.[39]  More importantly, Thomas offers no legal document or filing with any governmental body confirming any name change. Third, the Acuson ultrasound contract neither novated nor merged with the SMS ultrasound contract.  There is no writing demonstrating that there was a novation.

A "novation" is the "displacement and extinction of an existing valid contract" through the "substitution [of it with] a valid new contract."  *McCarl's, Inc. v. Beaver Falls Mun. Auth.*, 847 A.2d 180, 184 (Pa. Commw. Ct. 2004) (citation omitted); *Refuse Mgmt. Sys., Inc. v. Consol. Recycling and Transfer Sys., Inc.*, 671 A.2d 1140, 1145 (Pa. Super. Ct. 1996).  In other words, an old obligation or an original party is replaced by a new obligation or a new party.  *Id.  See also* Black's Law Dictionary 1091 (7th ed. 1999) (defining "novation" as the "act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party").  Additionally, for a novation to occur, both contracting parties must intend to extinguish their obligations under original contract and assent to the substituted contract.  *McCarl's*, 847 A.2d at 184; *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 148 (3d Cir. 1999); *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1071 (3d Cir. 1979).

Similarly, the FAR defines a "novation agreement" as:

> a legal instrument . . . [e]xecuted by the (i) Contractor (transferor); (ii) Successor in interest (transferee); and (iii) Government; and (2) By which, among other things, the transferor guarantees performance of the contract, the

---

[38] Rel.'s ex. 73 (Oct. 26, 2001 SMS Response to DSCP Multi-Modality Solicitation).

[39] Acuson became a division of Siemens Medical Solutions USA in 2002.  *See* Hibbits Dep. at 54-55.

> transferee assumes all obligations under the contract, and the Government recognizes the transfer of the contract and related assets.

48 C.F.R. § 2.101.  According to the FAR, there is no novation without a document creating it.

In the two pieces of evidence Thomas points to in support of his novation argument – a December 2002 letter from Jo Ann Brunetti[40] and an August 2003 email written by JoAnn Sweitzer[41] – the only references to the term "novation" were fleeting remarks, having no legal effect, in an internal email sent by a non-lawyer.  They were not describing an *actual* novation.  An examination of both documents actually shows that the two contracts did not merge or "novate."

In the 2002 letter, Brunetti said:

> As you know, Acuson was purchased by Siemens two years ago.  In that time, Acuson kept separate contracts from Siemens.  P.J. Ryland and myself were responsible for the Government contracts for ultrasound.  Now that we are fully integrated with our Siemens counterparts, at contract renewal it may be more logical to combine contracts.  Currently, there has been a change in responsibilities within our department.  Frank Biddlestone and JoAnn Sweitzer will be managing the ultrasound contracts for the Government for both Siemens and Acuson.[42]

The August 2003 email from Sweitzer stated:

> You will note that there are two Ultrasound contracts.  These

---

[40] Rel.'s ex. 55 (Dec. 12, 2002 letter from Brunetti to Gross of VANAC).  Brunetti and Priscilla ("P.J.") Ryland managed Acuson's contracts with the government for ultrasound products.

[41] Rel.'s ex. 80 (Aug. 26, 2003 email from Sweitzer to Miller and Biddlestone).  Sweitzer joined SMS in 2002.  Her duties included administering the 2001 SMS U/S Contract, and later the 2001 Acuson U/S Contract.

[42] Rel.'s ex. 55.

will be combined into one contract when I submit our new proposal in October.  In the meantime . . . the VA contract (797P6915a) is the former Acuson contract that we had novated.  Acuson did not have a contract in place with the DSCP at the time that we had transferred responsibility, so we introduced the Acuson products to our Multi-modality contract with the DSCP.  The other contract that we novated ownership from Acuson is one with the Navy.[43]

Why Sweitzer, who was not speaking as an attorney or in a legal context, used the word "novated" is unknown.  Nor is there evidence to suggest what she understood the term to mean.  What is clear is that despite Sweitzer's use of the word "novated," neither a novation nor a merger of the Acuson and SMS ultrasound contracts occurred.  The context of the rest of the language in the email and other undisputed evidence demonstrate that there was no novation.  In the two sentences preceding her reference to "novated," Sweitzer clearly states that two separate ultrasound contracts still existed.  Additionally, she has since clarified, in an affidavit, that VA did not want to combine the two contracts and they remained separated "for the life of the contracts."[44]

Because the Acuson and SMS U/S Contracts originated from the same VA solicitation for ultrasound equipment (Solicitation No. M6-Q9-00), the two contracts ran simultaneously.  Both contracts' original terms ended March 31, 2002, and both were renewed for two additional one-year terms expiring on March 31, 2004.  The SMS U/S Contract had been awarded two months earlier than the Acuson U/S Contract.[45]  But, the two contracts were negotiated by different employees from different divisions of SMS for

---

[43] Rel.'s ex. 80.

[44] Def.'s ex. 109 (Nov. 15, 2010 Sweitzer Decl.), ¶ 6.

[45] Def.'s ex. 12; Rel.'s ex. 47.

different equipment: Ryland and Brunetti negotiated for Acuson; Sasala and Biddlestone, for SMS.

Importantly, the two contracts continued to exist and operate independently of each other and were administered separately until both expired in March of 2004. This separateness is confirmed by numerous undisputed sources:

- A July 2004 list of SMS's contracts shows two separate entries for the Acuson and SMS U/S Contracts, and reflects that the contract periods for both contracts began in 2001 and expired on March 31, 2004.[46]

- SMS began to administer the Acuson U/S Contract more than six months after it was awarded for the purpose of billing and receiving payment from the government. It incurred no new legal obligations or liability by taking *administrative* responsibility for the contract. *See* Modification of Acuson U/S Contract ("designat[ing] SMS, effective as of January 1, 2002, to act as Acuson's agent for the purposes of: billing the government for its purchases of Acuson's products under [the Acuson ultrasound] Contract; and receiving payment for such purchases from the Government. . . . Nothing in this designation shall give rise to any government liability to SMS under the Contract.").[47]

- In the December, 2002 letter, Brunetti refers to the two contracts as continuing to operate, but with new personnel at SMS assigned to manage them. Specifically, she informs a VA contracting officer that she and Ryland would no longer be "responsible for the Government contracts for ultrasound," and instead, Biddlestone and Sweitzer would *manage* all "ultrasound *contracts*" that the government has with "*both* Siemens and Acuson."[48]

- In that same letter, Brunetti suggests that "it may be more logical to combine *contracts*" three months later "at contract renewal" time, which was April 1, 2003. However, in an affidavit submitted in this case, Sweitzer confirms that VA did not want to combine the two contracts and required that they remain separate until they expired on March 31, 2004.[49]

---

[46] Def.'s ex. 108 (July 21, 2004 SMS Spreadsheet of SMS contracts) at 9.

[47] Def.'s ex. 106 (Aug. 13, 2002 Modification to Acuson U/S Contract).

[48] Rel.'s ex. 55 (emphases added).

[49] Def.'s ex. 109 (Nov. 15, 2010 Sweitzer Decl.), ¶ 6.

- In the August 2003 email, Sweitzer states that "there are two ultrasound contracts."[50]

- In that same email, Sweitzer states that the two ultrasound contracts "*will be* combined into one contract when I submit our *new proposal* in October [2003]." (emphases added). Because both ultrasound contracts were due to expire in March of 2004, the "new proposal" to which Sweitzer refers is undoubtedly for a completely new contract for ultrasound equipment with VA, not for combining the two then-current contracts.

In sum, the evidence does not prove a novation or merger of the two contracts. Indeed, it proves the contrary. There was no substitution of an old obligation for a new one or an old party for a new party. Although Brunetti suggested to VA in December of 2002 that the parties "combine" the two contracts as of April 2003, VA did not agree to combine them. As late as August 26, 2003, Sweitzer confirmed that the two ultrasound contracts remained separate. Consequently, without VA's assent to novate the two contracts and merge them, there could not have been a novation. Thus, because the 2001 Acuson U/S Contract never legally merged into the 2001 SMS U/S Contract, the DPI form associated with the former cannot provide a basis for a claim under the latter.

DSCP Contract

SMS submitted its response to the DSCP solicitation on October 30, 2000. The contract was awarded on February 12, 2002. By agreement, the original expiration date of February 11, 2003 was extended by four years to February 11, 2007.

Thomas contends that this DSCP contract is at issue because when the 2001 Acuson U/S, 2002 CT/MR and 2003 NM Contracts (the agreed-upon contracts) expired, VA began purchasing the same CME that it had purchased under those three contracts

---

[50] Rel.'s ex. 80.

solely under the DSCP contract.  Asserting that "VA treated its own contracts and the DSCP contract as interchangeable," Thomas argues that the DSCP contract and the agreed-upon VA contracts were "integrated" because the terms and conditions of the expired contracts were applied to the DSCP contract.[51]

SMS argues that only the three agreed-upon contracts are at issue because false claims based on all other contracts were dismissed.  Additionally, although SMS concedes that discounts offered to VA were "generally" the same as those offered to DSCP, it disputes that the agreed-upon VA contracts were integrated into the DSCP contract.  It argues that VA never treated the contracts as "interchangeable" and the contracts were never integrated.  SMS points out that the DSCP Contract was negotiated and executed by a different, separate federal agency (the Department of Defense), negotiations took place *before* the 2002 CT/MR and 2003 NM Contracts were negotiated, and the DSCP and VA contracts were administered independently of each other.

Thomas argues that even though he neither identified the DSCP contract nor specified any false statements SMS had made in procuring it in his second amended complaint, he is not precluded from asserting new claims based on this contract because we did not specifically prohibit him from bringing claims based on it.  In ruling on SMS's motion to dismiss, we examined allegations regarding SMS's false statements made in the procurement of the agreed-upon contracts, and we considered Thomas's references to a listing of numerous other contracts that we had presumed were listed in Exhibit 8 to the

---

[51] Rel.'s Resp. Br. at 5-8 & n.11.

complaint.[52]  We held that merely listing a contract without specifying the false statements that allegedly induced VA to enter into the contract lacked the requisite particularity to state a false claim under the FCA.  708 F. Supp. 2d at 515.  Thomas now argues that because the "DSCP contract was not among the contracts listed on Exhibit 8 to Thomas's Second Amended Complaint that this Court ruled could not be pursued," he is not precluded from bringing a claim based on the DSCP contract, which was listed on Exhibit 3 to the complaint.[53]

Thomas is correct that we did not expressly preclude him from presenting claims based on contracts listed in Exhibit 3 to the second amended complaint and did not specifically prohibit him from asserting claims based on the DSCP contract.  At the motion to dismiss stage, Thomas never referred to the DSCP contract and created the impression that Exhibit 8 listed all seventeen additional contracts.  Because his merely listing a contract is insufficient to state a false claim under the FCA, and he did not specify any false statements SMS allegedly made in procuring the DSCP contract, he cannot now bring a

---

[52] *See* Opinion on Mot. to Dismiss, *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 515 (E.D. Pa. 2010).  Without identifying the specific exhibit numbers, SMS argued that there were a "dozen or more contracts that appear in the Complaint's exhibits [that] must be dismissed for failure to allege with particularity – indeed, to allege at all – a single false statement by SMS in connection with obtaining them." Doc. No. 32 at 27.  In response, Thomas argued that the court could "infer that each of the contracts listed in Exhibit 8 to the Complaint are associated with a prior misrepresentation."  Doc. No. 41 at 14.  In its reply, SMS referred to the "17 other contracts that are merely listed in exhibits to the Complaint."  SMS was correct when it counted seventeen additional contracts listed in the two exhibits to the complaint because Exhibit 8 refers to fourteen contracts other than the agreed-upon contracts, and Exhibit 3 refers to three additional contracts, including the DSCP contract.  But, because SMS did not identify the exhibits it mentioned, and Thomas cited only "Exhibit 8" in its response, we presumed that Exhibit 8 listed all seventeen of the additional contracts.  Thomas has now alerted us to the contents of Exhibit 3.

[53] Rel.'s Resp. Br. at 5 n.6.  Exhibit 3 lists the DSCP contract and two other contracts.

claim based on that contract because it was listed in a different exhibit.[54]

In order to bring a claim based on the DSCP contract, Thomas must prove that one or more of the agreed-upon contracts novated into the DSCP contract.  In support of his position that the agreed-upon contracts became integrated with the DSCP contract,  he points to the following evidence.  On September 22, 2004, approximately six months *after* the Acuson and SMS U/S Contracts expired, DSCP wrote an amendment to its contract with SMS giving VA authority to purchase CME off the DSCP contract.[55]  Ten months *before* the DSCP contract was amended, the Acuson and SMS U/S Contracts were amended, allowing DSCP authority to purchase ultrasound equipment under the VA ultrasound contracts.[56]  Additionally, an SMS internal document listing its contracts reflects that once the Acuson and SMS U/S Contracts expired on March 31, 2004, SMS should "use DSCP contract" for selling ultrasound products to VA.[57]

Regarding the 2002 CT/MR contract, Thomas cites a 2005 letter from VANAC to SMS sent shortly before the contract was set to expire on March 31, 2005.  In the letter, VA notified SMS that if VA received SMS's DSCP contract by March 31, it would let the CT/MR contract expire and then order CT/MR equipment off the DSCP contract.  On the

---

[54] Thomas also argues that because we allowed him to obtain discovery on the DSCP contract, we implicitly ruled that he may pursue claims based on that contract.  Allowing discovery on the contract is not equivalent to allowing claims based on that contract.

[55] Rel.'s ex. 93.  Specifically, the amendment states that "ordering authority is hereby granted to the VA National Acquisition Center (VA-NAC), Hines, IL."  *Id.*

[56] The proposed amendment to the Acuson and SMS VA ultrasound contracts, which VA submitted to Acuson and SMS on Nov. 21, 2003, and which Acuson signed on January 15, 2004, reads: "This modification adds DSCP to this contract and allows them to place orders on behalf of their customers."  Rel.'s exs. 54, 56; Def.'s ex. 111.

[57] Rel.'s ex. 78 at 9.  *See also* Rel.'s ex. 95 (Sept. 21, 2005 email from Sweitzer) ("The [2001 Acuson U/S Contract] expired.  The only contract in place for acquisition of ultrasound orders is the DSCP contract.").

other hand, if it did not receive the DSCP contract before the March 31 expiration date, VA advised that it would extend the term of the CT/MR contract by one year to March 31, 2006.[58]

Thomas also points to the similarity of the terms and conditions applied to the CME ordered under the DSCP contract to the terms and conditions applicable to the expired ultrasound and CT/MR contracts.  In its response to VA's ultrasound solicitation and DSCP's multi-modality solicitation, SMS stated that its discount policy is to offer both VANAC and DSCP "the same discounts for products under contract."[59]  Similarly, SMS's manager of contract administration, Thomas Lengel, testified that discounts that had been offered to VA were "generally the same as [those] offered on the DSCP contract."[60]  In fact, during negotiations for the DSCP contract, SMS increased the discount it offered DSCP on two MR products from 33% and 34% to 35% "to be in line with" the discount negotiated on a *prior* CT/MR contract with VA.[61]  Additionally, after the DSCP contract was awarded, SMS expressed its willingness to provide DSCP with the same discounts on the same products that it had negotiated with VA.[62]

We conclude that the agreed-upon VA contracts are separate from and never merged with the DSCP contract.  The amendment to the DSCP contract granting VA authority to purchase off the DSCP contract the same modalities that it had purchased

---

[58] Rel.'s ex. 34 (Feb. 28, 2005 letter from Harvey at VANAC to Sweitzer).

[59] Rel.'s exs. 74, 81.

[60] Lengel Dep. at 73-74; Decl. of Thomas Lengel (Rel.'s ex. 9), ¶ 1.

[61] Rel.'s ex. 39 (Nov. 18, 2000 email to Sasala); Rel.'s ex. 88 at Bates 476862.

[62] Rel.'s ex. 77 (Nov. 14, 2002 email from Sasala to Sweitzer).

under the VA contracts does not, by itself, amount to an extension or novation of the expired VA contracts.

The DSCP contract was negotiated and executed by the procurement arm for the Department of Defense.  The three agreed-upon contracts were negotiated by VANAC, a different federal agency.  The solicitation forms, products, modalities, and contracting officers who negotiated and awarded the DSCP contract were different from those connected to the agreed-upon VA contracts.  Because the parties to the contracts and the negotiations leading up to the contract awards were different, and there is no evidence of coordination, the contracts did not  "merge" or become "integrated."

Because the DSCP and VA contracts were negotiated at different times by different parties and covered different products and modalities, and SMS submitted different disclosures to different agencies, any reliance VANAC contracting officers had placed on SMS's disclosures cannot be imputed to DSCP's contracting officers.  Nor could SMS's "knowing" disclosure of false information to VA's contracting officers be imputed to DSCP's contracting officers.  The only way these elements could be imputed from one party to another party and from one time period to another is if the DSCP contract was a novation of, or substituted contract for, the other contracts.  No novation of the three agreed-upon contracts happened here.  Thus, Thomas cannot prove that, in connection with the DSCP contract, SMS knowingly made false statements to the government which were capable of influencing the government's funding decision and upon which the government relied.

As explained earlier, for a novation to occur, the new contract must be substituted for an existing valid one.  This can occur only when an old obligation is replaced by a new obligation or an original party by a new party.

28

With respect to the DSCP contract, no new obligations or new parties replaced existing ones.  Just the opposite occurred.  An amendment was made to the DSCP contract between SMS and DSCP, not to the agreed-upon contracts between SMS and VA.  Specifically, on September 22, 2004, DSCP and SMS signed an amendment to the contract between DSCP and SMS giving VA authority to purchase CME off the DSCP contract.  None of the obligations from the VA contracts, such as discount amount or terms and conditions, were transferred or substituted by way of this amendment.  Additionally, because the agreed-upon contracts had expired, they were not valid, existing contracts at the time they purportedly were "extended," "novated," or "integrated" into the DSCP contract.

Thomas has not offered any evidence identifying what CME from the VA contracts were available and at what price on the DSCP contract.  He does not identify what the actual prices on the DSCP contract were in comparison to the prices for the same CME under the agreed-upon contracts.  Although its practice was to offer VA and DSCP discounts that were "generally the same" for the same CME, SMS was not required to give DSCP the same discounts.  SMS made a voluntary business decision to do so in most cases.  If anything, SMS *lowered prices* on CME on the *DSCP* contract to bring it *down* to the levels of the *VA* contract pricing.[63]

Additionally, even if VA purchased the same CME off the DSCP contract at the same prices that it had under the expired contracts, this does not constitute an extension or integration of the old contracts into the DSCP contract, allowing Thomas to base an FCA

---

[63] *See* Rel.'s exs. 39, 77.

claim on those purchases.  Thomas's fraudulent inducement claim is predicated on SMS's *knowing* misrepresentation of information to DSCP that was *material* to DSCP's decision to enter into its contracts on specific terms.  There is insufficient evidence showing how DSCP decided the pricing terms, including whether it relied on SMS's allegedly fraudulent disclosures, or that it would have not agreed to those terms had it known about SMS's alleged fraudulent disclosures in negotiating the agreed-upon VA contracts.  If SMS's disclosures influenced VA's contracting officers in negotiating pricing terms, it does not mean they influenced DSCP's contracting officers.  Nor can SMS's "knowing" disclosure of false information to VA's contracting officers be a "knowing" false disclosure to DSCP's contracting officers.

The only connection between the expired VA contracts and the DSCP contract provided by the September 2004 amendment to the DSCP contract was that VA, a party to the old contracts, was able to order CME off of the DSCP contract.  Discounts offered to VA were "generally" the same as those offered to DSCP.  Thus, because no obligations from the expired agreed-upon contracts were substituted, replaced or extended, the DSCP contract is not an extension of the VA contracts.

Even assuming the VA and DSCP contracts were "integrated" and the VA contract pricing was higher than the DSCP contract pricing, Thomas cannot recover damages on the DSCP contract for the period of time before the CT/MR and NM contracts came into existence.  Thomas's theory is that because SMS fraudulently induced VA to accept its higher pricing on the three agreed-upon contracts, the fraud continued when VA continued to pay the same higher prices when it began ordering off the DSCP contract.  But, if the fraudulently-induced prices did not yet exist because the DSCP contract was negotiated

*before* the CT/MR and NM contracts were negotiated, purchases off the DSCP contract for that time period cannot be based on the fraud alleged here.

Similarly, as SMS aptly points out, if Thomas were permitted to bring claims based on the DSCP contract, he would be precluded from seeking damages based on purchases made under the DSCP contract before the VA contracts expired. Before the VA contracts expired, they existed independently and simultaneously with the DSCP contract before any "integration" could have occurred.

<u>2000 SMS NM Contract</u>

This nuclear medicine imaging contract was awarded to SMS on May 8, 2000 and expired on March 31, 2001.

Even though Thomas does not assert that this contract is at issue, his expert includes this contract in his damages calculation.[64]  SMS argues that Thomas should not be permitted to claim damages arising under this contract because it was negotiated three years earlier than the 2003 nuclear medicine imaging contract at issue. We agree.

In sum, the 2001 SMS U/S Contract, the DSCP Contract and the 2000 SMS NM Contract are not at issue. The 2001 SMS U/S Contract is not at issue because the 2001 Acuson U/S Contract never merged or novated into it. Nor may Thomas pursue a claim based on the DSCP Contract because the agreed-upon VA contracts were never integrated or merged into it. Thomas may not claim damages arising under the 2000 SMS NM Contract because it was negotiated three years earlier than the 2003 nuclear medicine imaging contract at issue. Therefore, the only contracts that are at issue in this action are

---

[64] Def.'s ex. 134 (2000 NM CME award); Expert Rep. of John Johnson ("Johnson Rep."), ¶ 11 & n.5 (citing 2000 NM award).

the three "agreed-upon" VA contracts: the 2001 Acuson U/S Contract; the 2002 CT/MR Contract; and the 2003 NM Contract.

### Most-Favored Customer/Best Price Theory

In addition to his claim that SMS failed to *disclose* to the government the highest discounts it was offering commercial customers, Thomas contends, for the first time in his summary judgment papers, that SMS also had an obligation to *give* the government its best discounts.  Thomas bases this "best price" theory on: (1) SMS's use of the term "most-favored customer" in its correspondence to the government; and (2) references in SMS internal emails, pre-award audit letters, and Senate testimony given in 2005 by a manager of VAOIG indicating that the government should get the "best price."

At oral argument, Thomas's counsel backed off this theory, conceding that the government is not entitled to the best price.  He characterized "most-favored customer status" as the "price that . . . Siemens was required to disclose – not give."[65]  Additionally, he agreed that the FAR requires a "fair and reasonable price," which is different from "most-favored customer" price.[66]  But, because Thomas argues at length in his summary judgment response that SMS was obligated to *give* VA its "best price," and his expert assumed in his damages calculation that VA was entitled to the best price,[67] we shall address this argument.

---

[65] MSJ Tr. at 81, 10.

[66] *Id.* at 82.  *See also* Rel.'s Supp'l Mem. of Law in Further Opp'n to Def.'s Mot. for Summ. J. (Doc. No. 157)  ("Rel.'s Supp'l Mem. in Opp'n to MSJ") at 3 n.2 ("[T]he government is not necessarily entitled to Siemens's best price. However, the government is entitled to knowledge of, and Siemens was required to identify, the best price.") (citing Regan Decl., ¶¶ 4-5).

[67] *See* Johnson Dep. at 128-129.

Contrary to Thomas's argument, SMS did not have an obligation to *give* the government the highest discounts on the VA contracts at issue.  First, "most-favored customer" language does not appear in any contract or response to solicitation, but only in cover-letters regarding delivery – not price – terms.  Second, a "most-favored customer" or "best price" has no place in a contract governed by the FAR, which sets a "fair and reasonable" standard.  Third, VA did not expect to receive "most-favored customer" treatment.

*"Most-Favored Customer" Language*

Thomas argues that SMS "agreed to confer most-favored customer status on the government," and represented that "the government would enjoy most favored customer pricing and discounts."[68]  According to Thomas, "most-favored customer" means that the vendor is committed to *give* the government the best price on any product, at any time, no matter the terms and conditions of the sale.  He contends that these representations "became a contractual obligation by virtue of the incorporation of these representations into Siemens' contracts with the Government."[69]

In supplemental briefing in opposition to SMS's motion for summary judgment, Thomas asserts that his "best price" theory is not based on SMS's contractual obligation to give the government its best price, but on its false promises to give the government its best price for the purpose of inducing the government to award it contracts.[70]  Thomas's

---

[68] Rel.'s Resp. Br. at 10,11.

[69] *Id.* at 11.

[70] Rel.'s Supp'l Mem. of Law in Opp'n to SMS's Motions for Summ. J., to Preclude Thomas's Expert Johnson and to Disqualify Thomas as a Relator (Doc. No. 138) at 4.

counsel restated this position at oral argument when he said that SMS's "most-favored customer compliance promise was breached" after SMS had told VA that it would give it SMS's lowest price.[71]

In support of his contention that SMS was obligated to give the government its "best price" based on its having granted VA "most-favored customer status," Thomas points to letters that SMS sent to VA and DSCP in conjunction with its response to government solicitations and contract negotiations for various modalities of CME.  Each of these letters contains the following language:

> Siemens is compliant with the Government's Most-Favored Customer Clause, and delivery for all items shall be 180 days after receipt of order.[72]

This language appears under the heading "Equipment Delivery" in SMS's initial response to the government's solicitation for CT/MR CME.[73]  In other letters enclosing SMS's initial responses to solicitations, this language pertaining to delivery terms appears on the cover letter page with other administrative information about what is enclosed.[74]  In a letter that reflects ongoing negotiations for the CT/MR contract, the following additional language appears: "VANAC RESPONSE: will only accept 120 days after receipt of order. SIEMENS

---

[71] MSJ Tr. at 54:3-6.

[72] Only one letter – a response to a joint VA/DSCP solicitation sent in 2006 – does not refer to delivery terms.  *See* Rel.'s ex. 69 (June 22, 2006 letter from SMS to Harvey enclosing an initial response to a combined VA/DSCP solicitation stating that Siemens is "compliant with the Government's Most-Favored Customer Clause").  Because the DSCP contract is not at issue, we need not address it.

[73] *See* Rel.'s ex. 31 (Apr. 9, 2002 letter from Sasala to Harvey at VANAC in response to CT/MR solicitation).

[74] *See* Rel.'s ex. 50 (Dec. 20, 2000 letter from Sasala to Gross at VANAC in response to SMS U/S Contract solicitation); Rel.'s ex. 53 (Oct. 25, 2002 letter from Sweitzer to Lee at VANAC in response to SMS NM contract solicitation).

RESPONSE: Siemens will accept term of delivery 120 days."[75]

Additionally, Thomas relies upon SMS's December 10, 2001 response to the DSCP, the procurement arm for the Department of Defense, not the VA, in connection with the solicitation for the 2002 DSCP contract, where DSCP asked:

> 7.  Please verify that DSCP is receiving your most favorite [sic] price for similar guarantees and/or quantities.
>
> SIEMENS RESPONSE: DSCP is receiving our most favored pricing for like systems.[76]

SMS argues that the language "Siemens is compliant with the Government's Most-Favored Customer Clause" in the referenced cover letters does not mean that it is an incorporated term of the contract imposing an obligation to give the government the highest discounts.  It points out that no "most-favored customer" clause appears in any of the contracts at issue, nor in any other communications between SMS and VA.  Additionally, direct delivery contracts, like the contracts at issue, do not contain "most-favored customer" clauses because such clauses are inconsistent with the FAR, where "fair and reasonable price" is the standard.  *See* 48 C.F.R. §§ 15.402, 403-3, 404-1(a)-(d), 405, 406-1.[77]

After the parties submitted their summary judgment briefs, the government filed a declaration asserting that in direct delivery, multiple award contracts like the ones at issue, vendors are not required to *give* the government the best price.  They are only required to *identify* "most-favored customer" pricing, or the best price, offered to customers.  The government explains that because VA direct delivery contracts are awarded non-

---

[75] Rel.'s ex. 29 (Aug. 14, 2002 letter from Sasala to Harvey at VANAC regarding CT/MR solicitation).

[76] Rel.'s ex. 92 (author is Sasala).

[77] *See also* Darr Rep., ¶¶ 25-26, 46; Darr Dep. at 135-36, 145.

competitively to multiple vendors, VA contracting officers make "price reasonableness" determinations by comparing the discounts the vendor offers its commercial customers to the discounts being offered to VA.  Consequently, vendors must disclose on their DPI forms the best pricing they offer their commercial customers and state whether they are offering VA this best price.  Although vendors are required to disclose to VA their "most-favored customer" pricing, "there is no law, regulation, or contract provision that requires vendors to offer MFC [most-favored customer] pricing to VA."[78]

SMS's employee, JoAnn Sweitzer, explained that the "most-favored customer" language in those cover letters was mistakenly included because it was copied from a template of cover letters from expired contracts executed under a different contractual scheme.[79]  There is no evidence that VA relied on this language or expected "most-favored customer" prices.  Indeed, the evidence is to the contrary.

The Summary of Award documents "incorporate" the cover letters into the contracts.[80]  But, VA's solicitation documents are also incorporated into the contracts. These solicitation documents do not contain a "most-favored customer" clause because such a standard is inconsistent with the "fair and reasonable price" standard in the solicitation.[81]  Additionally, although the cover letter from SMS responding to the ultrasound

---

[78]Regan Decl., ¶¶ 4-5.

[79] Sweitzer Decl., ¶¶ 4-5.

[80] *See* Rel.'s ex. 35 (CT/MR Contract Summary of Award) at Bates 0001306 ("The following award documents are incorporated as part of this contract: . . . cover letter dated 4/9/02. . . ."); Rel.'s ex. 52 (NM Contract Summary of Award) at Bates 214561; Def.'s ex. 12 (Acuson U/S Contract Summary of Award) at Bates 214619.

[81] *See, e.g.,* Def.'s ex. 10 (NM Contract Solicitation M6-Q7-02) at Bates 2228527, Part V, p. 44 ("The offeror shall submit . . . information on prices at which the same item or similar items have previously been sold in the commercial market that is adequate for evaluating the reasonableness of the price for this

solicitation stated that it was "compliant with the government's most-favored customer clause," the cover letter from Acuson responding to the same solicitation did not.  That the same VA contracting officer authorized the award of the ultrasound contract to Acuson without the phrase is additional evidence that the inclusion of the phrase in the cover letter was not a necessary condition for granting the award.

Importantly, SMS uses the "most-favored customer" language in the context of describing delivery terms or administrative matters.  It does not relate to pricing of CME.

SMS's statement in response to the 2002 DSCP solicitation that "DSCP is receiving our most favored pricing for like systems" applied to a contract that is not at issue.  It did not apply to the contracts in dispute.

Because the language in the cover letters states that SMS is compliant with a clause that is not included in any contract document, including any other communications between SMS and VA, and because direct delivery contracts do not contain "most-favored customer" clauses, the "most-favored customer" language in the letters sent with the responses to the contract solicitations at issue did not impose an obligation on SMS to *give* VA the "best price."  Furthermore, because the contracts were negotiated under the FAR, which does not use the "most-favored customer" standard, the contracting officers could not have been misled by the mention of "most-favored customer" in communications regarding delivery terms.

*"Best Price" Language*

Thomas also claims that SMS employees "understood their obligation to accord the

---

acquisition.").

Government the best price."[82]  According to him, this understanding, right or wrong, bound

SMS to give its best price.  He also argues that because the government expressed its

"concern that it receive the best price," both during the pre-award audits and in Senate

testimony given in 2005 by a VAOIG manager, SMS knew it had the obligation to give the

government its best price.[83]

He points to statements made by SMS personnel as evidence that SMS believed

that the government should get the "best price."  First, Thomas cites a December 10, 2001

response from SMS to DSCP in connection with the solicitation for the DSCP contract.

DSCP's question and SMS's response were as follows:

> 6. Please state if your commercial market receives volume
> discounts and how the government's discount compares
> (better/worse and why).
>
> SIEMENS RESPONSE: All volume discounts for Siemens
> commercial customers are on a site specific basis so no
> comparisons can be made. Government always receives best
> pricing in like systems.[84]

This statement does not apply here.  It was submitted in response to the solicitation

for the DSCP contract, which is not at issue.

Second, Thomas also relies on three internal SMS documents in support of his "best

price" claim.  The first, a November 2005 email between SMS division managers, states

that "[VA] should be at the best price compared to pricing offered other customers."[85]  The

---

[82] Rel.'s Resp. Br. at 12.

[83] *Id.*

[84] Rel.'s ex. 92.

[85] Rel.'s ex. 79.

second, an October 2007 internal email written by SMS's VP National Accounts, states: "[W]e have to protect our govt pricing.  We have proposed a discount structure that would step off of the govt pricing."[86]  Thomas contends that an unspecified "failed audit set in motion" this proposal for "corrective price changes."[87]  The third document is a Power Point slide from 2008, which states: "Government ALWAYS gets lowest price" and "Government NEVER pays more than a commercial customer."[88]

All three documents were created in, and pertain to, the period from 2005 to 2008, *after* the relevant time period in this case.  More importantly, none of them demonstrates that SMS had a "contractual obligation" or was "contractually bound" to give the government the best price.  They were not representations made to the government.  At most, they reveal SMS's policy or business decision – not its obligation – to give the government the lowest price.

In support of his argument that the government communicated to SMS its "concern that it receive the best price," Thomas relies on two types of evidence.  He cites the language in the pre-award audit letters for the Acuson ultrasound audit and the SMS CT/MR audit, in which VAOIG stated that the primary purpose of the audit was to determine whether the "proposed prices and discounts were equal to or better than those offered to the offeror's most-favored customers."[89]  Additionally, he refers to testimony given by VAOIG Director of Contract Review in 2005 before a Senate subcommittee that

---

[86] Rel.'s ex. 84.

[87] Rel.'s Resp. Br. at 30-31.

[88] Rel.'s ex. 45 at Bates 00062512.

[89] Rel.'s exs. 60, 76.

the goal of pre- and post-award audits of Federal Supply Schedule ("FSS") contracts is "to ensure the Government receives the best possible prices," and to "evaluate the CSP [Commercial Sales Practices] information provided by the vendor and determine whether offered prices are fair and reasonable."[90]

Neither the pre-award audit letters nor the Senate testimony supports Thomas's theory that the government communicated to SMS that it had, or knew it had, an obligation to give the government the best price. The language Thomas cites from the pre-award audit letters refers to the government's *inquiry* about the discounts vendors were giving their commercial customers. It does not impose an obligation on the vendor to *offer* the government that price.

The cited Senate testimony does not support the notion that SMS had an obligation to give VA the best price or that VA was *entitled* to the best price. Rather, it supports what SMS acknowledges is the standard – the government determines whether the prices offered are "fair and reasonable," and strives to get the best possible price for itself, taking into consideration factors other than price.[91]

---

[90] Rel.'s ex. 100 at 2, 3.

[91] There are additional reasons this Senate testimony does not support Thomas's position. First, it was given after the relevant time period applicable to this action. More importantly, it refers to FSS contracts, not direct delivery contracts. FSS contracts work differently than direct delivery contracts. FSS contracts are managed by the General Services Administration ("GSA"). These schedules enable federal agencies to place purchase orders directly with commercial entities under blanket terms and conditions previously negotiated by the GSA. 48 C.F.R. §§ 8.402(a), 38.101(a); Feldman, Steven, *Government Contract Awards; Negotiation and Sealed Bidding*, Thomson Reuters (2011), § 23:5 at 1103. Only certain elements of FSS contracts are governed by the FAR. The requirements of the FAR apply to the solicitation and award of the prime FSS contracts. Feldman, § 23:6. However, the FAR does not apply to blanket purchase agreements or orders placed against FSS contracts. 48 C.F.R. §§ 8.404(a), (d) ("GSA has already determined the prices of supplies . . . under schedule contracts to be fair and reasonable. Therefore, ordering activities are not required to make a separate determination of fair and reasonable pricing.") Additionally, FSS contracts are subject to price reductions *after* the government awards a contract if the vendor reduces its catalog prices or increases discounts given a commercial customer upon which the government contract was based. 48 C.F.R. §§ 538.270, 272; 552.238-75. In contrast, the direct delivery VA contracts do not require vendors to offer price

The application of Thomas's "best price" theory underscores its flaws.  The vendor is already required to *disclose* its best price, which is the price the government would get under his theory.  In his scheme, there would be no room for negotiations.  In this case, SMS disclosed to VA numerous discounts it was giving to non-governmental customers that were greater than the discounts it was *offering* VA, negotiations ensued, and VA accepted SMS's lower discount *offer*.  The negotiations involved numerous terms of the contract, not just price. The price may have been adjusted by more favorable other terms, such as delivery time, quality of product, and customized product features.  In other words, VA did not insist on receiving a greater discount.  If it had been entitled to or promised the "best price," VA would have awarded the contract based on SMS's highest commercial discount without engaging in any negotiations.   Why would VA have gone through negotiations and accepted less than the lowest price if there was a best price obligation or promise?  That VA awarded a contract based on the lower, offered discount demonstrates that SMS did not have a contractual obligation to *give* the government the best price.[92]

Thomas undercuts his "best price" theory when he asserts in a later filing that his

_____

reductions during the term of the contract.  Regan Decl., ¶ 6. Finally, the VANAC administers FSS contracts for the procurement of pharmaceuticals and other healthcare products and services, not high-cost CME.  Darr Rep., ¶ 20.

[92] In any event, even if we accepted Thomas's "best price" theory that SMS had a duty to both disclose *and* offer the government its best price in like systems, this would affect only his claim for damages, not liability.  We have concluded, and SMS concedes, that SMS had a duty to *disclose* its best prices in like systems.  If SMS failed to meet that disclosure requirement, it could be liable under the FCA.  To determine damages, Thomas would have to show what price the government would have negotiated had SMS disclosed its best prices.

If we accepted Thomas's theory that SMS also had a duty to *offer* the government its best price, Thomas would not be required to show what price the government would have negotiated had SMS properly disclosed the pricing information.  In that case, VA would have been entitled to the best prices SMS had given to its non-governmental customers, and damages would be based on the difference between the best prices and the actual prices SMS charged VA.  Thus, his "best price" theory would be relevant only with respect to calculating VA's damages.

theory is not in fact based on SMS's contractual obligation to give VA its best price, but on the premise that SMS used the promise of giving VA its best price to induce the government to award it contracts.   Changing course, Thomas appears to abandon his previous argument that the "most-favored customer" language in cover letters contractually bound SMS to offer the government its best price.   His recent theory, like his earlier one, fails to take into account that no matter what price SMS *offered*, VA was always entitled to *know* the best price SMS gave to its commercial customers.   Thus, according to both SMS and Thomas, SMS could be held liable under a fraudulent inducement theory for failing to *disclose* its best price.

We conclude that although it was required to *disclose* to VA the highest contract discounts that it gave to private customers, SMS had no obligation to *offer* VA the "best price" or greatest discount given to any customer.   Thus, liability based on a best price or most-favored customer theory fails.

### Summary Judgment Standard

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party.   Fed. R. Civ. P. 56(a).   Once the moving party has met its burden, the

nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

### Meaning of "False Claim" Under the FCA

Thomas asserts claims[93] under two provisions of the FCA: section 3729(a)(1), knowingly presenting a false or fraudulent claim for payment or approval to the government; and section 3729(a)(2), knowingly making a false record or statement to get a false or fraudulent claim paid or approved by the government.[94]

To establish a *prima facie* case under the FCA, the relator must prove that the defendant made or submitted a materially false statement or claim to the government, and the defendant knew the statement or claim was false or fraudulent.  *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007); *Harrison v. Westinghouse Savannah River Co.* ("*Harrison I*"), 176 F.3d 776, 788 (4th Cir. 1999).  To

---

[93] In the second amended complaint, Thomas asserted a claim under § 3729(a)(7), known as a "reverse false claim," and a claim under § 3729(a)(3), alleging that SMS and its parent company conspired to defraud the government by getting a false or fraudulent claim allowed or paid.  We dismissed both of those claims.  708 F. Supp. 2d at 515 & n.8.

[94] 31 U.S.C. §§ 3729(a)(1)-(2) (2003).

constitute a "claim" under the Act, the fraudulent statement or action must "have the purpose and effect of causing the government to pay out money." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 183 (3d Cir. 2001) (citation omitted).

This is not a typical false claims action where the defendant is alleged to have given an inaccurate description of goods or services provided, or requested reimbursement for goods or services not provided.  Indeed, Thomas acknowledges that on invoices to VA for payment for CME, SMS neither misidentified the CME actually provided to VA nor billed VA for equipment not supplied.  Instead, Thomas pursues a fraudulent inducement theory, alleging that SMS made false representations and omitted pertinent information that fraudulently induced the government to enter into the contracts at issue.

A relator may bring an action under the FCA based on invoices submitted to the government which are deemed false claims because they were for payment pursuant to contracts that were fraudulently induced.[95]  The legislative history of the 1986 amendments to the FCA reveals that Congress recognized this type of claim.  S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5266, 5274 ("[E]ach and every claim submitted under a contract, loan guarantee, or other agreement *which was originally obtained by means of* false statements or other corrupt or fraudulent conduct, . . . constitutes a false claim.") (emphasis added)).  Both prior to and since the FCA was amended in 1986, numerous courts have acknowledged this type of FCA claim.  *See, e.g.*, *United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959) ("[A] fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder

---

[95] MSJ Tr. at 65:24-66:5) (relator's counsel acknowledging standard).

by the government. . . .") (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537,  543-44 (1943)); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) ("liability will attach to each claim submitted to the government under a contract, when the contract . . . was originally obtained through false statements or fraudulent conduct"); *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) ("[C]ourts have employed a 'fraud-in-the-inducement' theory to establish liability under the Act for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves.") (citation omitted); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467-68 (5th Cir. 2009) (where a contract was procured by fraud, even when subsequent claims for payment under the contract were not literally false, they became actionable FCA claims because they "derived from the original fraudulent misrepresentation"); *Harrison I*, 176 F.3d at 787-88 (surveying the case law on fraud-in-the-inducement FCA liability and holding that liability extends to claims made pursuant to a contract that was obtained through false statements or conduct even if "the claims that were submitted were not in and of themselves false" because of the "fraud surrounding the efforts to obtain the contract"); *Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (recognizing a fraudulent inducement claim under the FCA based on obtaining a government contract through false statements) (citing *Harrison I*, 176 F.3d at 787).

To survive summary judgment, Thomas must show that there are genuine issues of material fact regarding whether SMS made knowingly false statements or omissions. If he does, then he must demonstrate that there are factual disputes about the materiality

of those statements and omissions, and whether they induced the government to enter into the contracts with SMS.

To establish knowledge under the FCA, a relator must prove that the defendant acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of information. *Hefner*, 495 F.3d at 109 (quoting 31 U.S.C. § 3729(b)). Specific intent to defraud is not required. *Id.* Yet, Congress has expressed "'its intention that the [A]ct not punish honest mistakes or incorrect claims submitted through mere negligence.'" *Id.* (quoting *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir.1998). Without more than a relator's subjective interpretation of an imprecise contractual provision, a defendant's reasonable interpretation of its legal obligation precludes a finding that the defendant had knowledge of its falsity. *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983-84 (D.C. Cir. 2008); *Wilson*, 525 F.3d at 378; *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). Further, if the defendant knew that despite the government's awareness of the statement's falsity it "was willing to pay anyway," the defendant "cannot be said to have knowingly presented a fraudulent or false claim." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (concurring opinion); *United States ex rel. Marquis v. Northrop Grumman Corp.*, No. 09-7704, 2013 WL 951095, at *2 (N.D. Ill. Mar. 12, 2013) ("[T]he Government's knowledge and approval of the particulars of a claim for payment before that claim is presented . . . effectively negates the fraud or falsity required by the FCA.") (citation omitted); *United States v. Bollinger Shipyards, Inc.*, No. 12-920, 2013 WL 393037, at *6 (E.D. La. Jan. 30, 2013) (where government alleged the defendant knowingly misled the Coast Guard to enter into a contract for the

46

lengthening of the Coast Guard cutters by falsifying data relating to the structural strength of the converted vessels, a "fraud in the inducement theory . . . misses the mark" where "the government acknowledges that it knew" about the design specifications the defendant proposed to use to construct a vessel and proceeded with the contract with that understanding); *United States Dep't of Transp. ex rel. Arnold v. CMC Eng'g, Inc.*, No. 03-1580, 2013 WL 2318813, at *7 (W.D. Pa. May 28, 2013) ("'when the government knows and approves of the facts underlying an allegedly false claim prior to presentment, an inference arises that the claim was not knowingly submitted, regardless of whether the claim itself is actually false.'") (citation omitted)).

"[The FCA] was not intended to impose liability for every false statement made to the government." *Hutchins*, 253 F.3d at 184 (citation omitted). The statute "'is only intended to cover instances of fraud that might result in financial loss to the Government.'" *United States ex rel. Sanders v. American-Amicable Life Ins. Co. of Texas*, 545 F.3d 256, 259 (3d Cir. 2008) (quoting *Hutchins*, 253 F.3d at 183). Thus, there is liability under the FCA only for fraudulent activity or claims that "'cause or would cause economic loss to the government.'" *Id.* (quoting *Hutchins*, 253 F.3d at 179).

A statement or omission is material if it has a "'natural tendency to influence or [was] capable of influencing the government's funding decision.'" *See, e.g.*, *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (citation omitted); *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1459 (4th Cir. 1997). The materiality inquiry "'focuses on the potential effect of the false statement when it was made, not on its actual effect when it is discovered.'" *A+ Homecare*, 400 F.3d at 445 (quoting *United States ex rel. Harrison v. Westinghouse*

*Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) ("*Harrison II*")); *Longhi*, 575 F.3d at 458 (to be material, the false or fraudulent statements need only have the "potential to influence the government's decisions."). Additionally, omitted information that a defendant had no obligation to disclose cannot be deemed material. *Berge*, 104 F.3d at 1461 (4th Cir. 1997) ("There can only be liability under the [FCA] where the defendant has an obligation to disclose the omitted information.") (citation omitted). Thus, to survive summary judgment on materiality, Thomas must point to information omitted from the DPI that was capable of influencing VA in the negotiations and award of the contracts at issue.

To prevail under his fraudulent inducement theory, Thomas must prove not only that the omitted information was material but also that the government was *induced* by, or relied on, the fraudulent statement or omission when it awarded the contract. *Hess*, 317 U.S. at 543-44. In essence, the essential element of inducement or reliance is one of causation. Thomas must show that the false statements upon which VA relied, assuming he establishes that it did, caused VA to award the contract at the rate that it did.

In *Hess*, an FCA fraudulent inducement claim was established because the federal government would not have approved funding payments to the defendant electrical contractors pursuant to contracts they obtained with local municipalities had its agents known that the defendants obtained the contracts through fraudulent collusive bid-rigging. The Supreme Court held that because the contracts were awarded "as the result of the fraudulent bidding," the defendants "*caused* the government to pay claims" that were false. *Id.* at 543 (emphasis added). In other words, to establish FCA liability for fraudulent inducement, the false statement must have "caused" or "induced" the government to enter into a contract, such that but for the misrepresentation, the government would not have

48

awarded the contract and would not have paid the claim.  *Harrison I*, 176 F.3d at 794 (relator stated claim for fraud-in-the-inducement where he alleged the defendant made intentional misrepresentations to the government about matters material to the government's decision to grant a subcontract, and these false statements caused the government to pay "claims" at a higher cost than it would have paid absent the fraud); *Veneziale*, 268 F.2d at 506 ("The [FCA] claim before us now is certainly 'grounded in fraud' in that a fraudulent misrepresentation induced the government to assume the obligation which it has had to perform."); *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. 1977) (to prove the defendant made a false claim by misrepresenting its qualifications for government employment, relator had to "demonstrate that the government was misled" by defendant's misrepresentation of its qualifications on its application and hired defendant on that basis).

Once it is determined that a contract has been procured by fraud, then each claim – though not false on its face – that is submitted under the falsely procured contract constitutes a false claim.  As stated in *Hess*, once it was shown that the government entered into the contract "because of" the collusive bidding, the:

> fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [Public Works Administration] into the joint fund for the benefit of respondents. The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal – payment of government money to persons who had caused it to be defrauded.

*Id.* at 543-44.

Thomas argues that he need not prove that the government relied on the statement

because the inducement or reliance element is duplicative of the materiality element.  He states that it "would serve no purpose to require a relator to show that a statement has a natural tendency to influence or was capable of influencing the government if the relator also had to prove the government was in fact induced to act.  The cases under the FCA don't require that."[96]  He further argues that all he must show to make out a fraudulent inducement claim is that the defendant misrepresented pricing information to the government.  He contends that once a misrepresentation is shown, "as a matter of law, there is a causal connection between [SMS's] failure to provide [pricing] information and the resulting transaction."[97]  Citing *Hess*, he argues that if there is fraud in just one stage of the contracting process, this causes a "taint" to enter into every subsequent part of the process, such that the "initial fraudulent action and every step thereafter taken" are reachable under the FCA."[98]

Thomas is correct that in a typical FCA case, such as one based on government payment for goods or services not provided, there is no reliance or inducement requirement.  In those cases, the "submitter of a 'false claim' or 'statement' is liable for a civil penalty, regardless of whether the submission of the claim actually causes the government any damages; even if the claim is rejected, its very submission is a basis for liability."  *Bettis*, 393 F.3d at 1326 (citation omitted).  But, for a claim based on the fraudulent inducement of a contract, a plaintiff is also required to show that the government

---

[96] Rel.'s Resp. Br. at 46.

[97] MSJ Tr. at 54-56.  *See also* MSJ Tr. at 47, 89, 90 ("[A]ttempted fraud is as wrongful as accomplished fraud . . . . We submit that the plaintiff . . . is not required to prove that the government was defrauded to make out a false claim.  Simply submitting a false statement . . . without payment is sufficient.").

[98] Rel.'s Supp'l Mem. in Opp'n to MSJ at 2-3.

relied on, or was induced by, a material false statement in deciding to award a contract. Consequently, a defendant in a fraudulent inducement case is liable for each claim submitted to the government under the contract *only* if that *contract was procured by* fraud. *Bettis*, 393 F.3d at 1326.   *See also* S. Rep. No. 99-345, at 9, reprinted in 1986 U.S.C.C.A.N. at 5274 ("each and every claim submitted under a *contract . . . which was originally obtained by means of false statements* . . . constitutes a false claim") (emphasis added).

As the *Hess* Court explained, FCA liability based on facially true claims submitted under the contract was predicated on the threshold showing that collusive bidding caused the government to award the contract.  317 U.S. at 543.  Only then could the "taint" of the initial fraudulent action reach every subsequent claim submitted under the contract.  Thus, before Thomas can claim that any purchase made pursuant to the contracts at issue constituted a false claim, he must first show that fraudulent statements made by SMS induced the government to enter into a contract that it would not have entered into but for the misrepresentations.

Requiring reliance in a fraudulent inducement case makes sense.  In a typical FCA claim, the rationale for finding liability even in the absence of the government's actual loss of funds is that the FCA covers all fraudulent attempts to cause the government to pay money.  *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 438 (3d Cir. 2004) (citing *Harrison I*, 176 F.3d at 788); *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  A claim for payment that is false *on its face* is a classic example of an attempt to cause the government to pay money based on false pretenses.  In contrast, in a fraudulent inducement case each claim for payment is *not* false *on its face*.  The liability in that

instance attaches to the "facially true" claim for payment because it "derived from the original fraudulent misrepresentation." *Longhi*, 575 F.3d at 467-68. If a false statement did not actually cause the government to award the contract, then the claims paid under the contract did not derive from an original fraudulent misrepresentation. A false statement made in the *process of procuring a contract* is not the same as a false *claim for payment submitted to the government*. Thus, the FCA requires the plaintiff in a fraudulent inducement case to establish that the *decision to award a contract* was *actually*, not just potentially, based on a false statement.

Put another way, in an ordinary FCA case, a defendant who has merely *attempted* to obtain payment from the government by submitting a claim containing a materially false statement will be held liable under the FCA, even if the government rejects the claim and pays out no money. In contrast, in a fraudulent inducement case, a defendant who attempts to induce a contract award by making a materially false statement will *not* be held liable for making a false claim *unless* the government relied on and was induced by the false statement to award the contract. An *attempted* fraud is not enough - it must be an accomplished fraud.

In summary, materiality and inducement are separate and distinct elements. Proving materiality does not prove inducement or reliance. Even if the false statement is material, there is no violation unless the government relied on it. Thus, Thomas must prove both materiality and inducement to make out a fraudulent inducement claim under the FCA.

Thomas relies on *United Stated ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), and *United States v. Eghbal*, 475 F. Supp. 2d 1008 (C.D. Cal. 2007), as supporting

his argument that he need not prove that VA was actually misled by SMS's statements or omissions. The *Grubbs* and the *Eghbal* cases do not support his position. *Grubbs* is not a fraudulent inducement case. It involved a typical false claim scenario where the defendants allegedly submitted requests for payment to Medicare for services that had not been rendered. The court stated that the "complaint need not allege that the Government relied on or was damaged by the false claim" because the FCA "exposes even unsuccessful false claims to liability." 565 F.3d at 189. This statement is accurate with respect to non-fraudulent inducement cases.

*Eghbal* is a false certification case[99] that involved the Department of Housing and Urban Development's ("HUD") insuring lenders against loss on mortgage loans made to eligible home buyers. In the event the borrower defaulted and the lender foreclosed, the lender could submit a claim to HUD for the balance due on the loan. Because HUD would not insure a loan for a home for which the down payment had been paid by the seller, the seller had to sign a certification that he had not contributed to any of the down payment. The defendants were real estate investors who sold properties to borrowers who received

---

[99] Recently, Thomas asserted that standards from a false certification claim apply to this case. *See* Relator's Identification of False Statements by Def. ("Rel.'s ID of False Statements") (Doc. No. 154), ¶ B.1 (stating that SMS falsely certified compliance with the government's requirement to certify that all statements made by it in its offers were "current, complete and accurate"); MSJ Tr. at 14, 93 ("The government has been cheated because a false certification was given to it . . . . These defendants have certified that their information is accurate, complete and they have offered -- they have disclosed information. Those are certifications as well.").

This is not a false certification case. Vendors seeking contracts for CME are exempt from the requirement of providing certified cost or pricing data. *See* 48 C.F.R. §§ 15.402(a)(2),15.403-1(b), 15.403-3, 2.101(b). For the same reasons the standards for a typical FCA claim do not apply to a fraudulent inducement case, the standards for a false certification claim do not apply to this case. In a false certification case, an actionable certification is a "condition of payment," satisfying the requisite nexus between the false statement and false claim. *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 309 (3d Cir. 2011) ("[U]nder a false certification theory, either express or implied, a plaintiff must show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government.").

HUD-insured mortgage loans.  The defendants signed false certifications stating that they had not contributed to any of the down payments when in fact they had.  *Id.* at 1010-11. Although the court stated that "[r]eliance is not an element necessary to establish FCA liability," *id.* at 1013, n.7, it stated that the government still had to prove that it "would not have guaranteed the loan 'but for' the false statement [that the sellers had not contributed to any of the down payment]."  *Id.* at 1014 (citations omitted).  The court held that the government had to prove that the false statement *actually affected* its decision to provide the insurance.  Thus, although the court did not use the term "reliance," it concluded that the government had to prove that it had been misled by the defendant's false statement.

Finally, in addition to proving that SMS knowingly made a materially false statement that induced the government to award it a contract, in order to prevail on his claims under the FCA and recover damages, Thomas must show loss causation.  He must establish that VA suffered damages *because of* SMS's false or fraudulent conduct.  *See Longhi*, 575 F.3d at 467 (the fraud must have caused the government to pay out money that it otherwise would not have paid); *United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 16 (D.D.C. 2011) ("damages are measured as the difference between what the government actually paid and what the government would have paid had it known of the falsity of the defendant's claim") (citing *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995)).

SMS contends that Thomas must show both that a false statement or omission caused VA to award a contract at an inflated price and the contract price caused the invoices at the point of sale to be inflated.  It argues that Thomas  has no evidence that the government could or would have negotiated a higher contract discount had it seen the

higher discounts that SMS purportedly omitted from its DPI forms and audit disclosures. It further asserts that because the government had an opportunity to negotiate additional, greater discounts at the transactional stage when purchasing an actual item of CME, and most, if not all, of the transactions had higher discounts than the contract rate, Thomas cannot show a causal link between the contract price and the final, actual price VA separately negotiated at the transactional level for each purchase order. Because individualized "best value" determinations determined the final prices for CME for each transaction, SMS contends that this is an intervening factor that breaks the chain of causation from a false statement to the ultimate claim for payment.[100]

Thomas contends that competitive negotiation at the transactional level does not cure SMS's fraud. He argues that the "lower discounts in the contracts tainted the negotiated prices at the transaction level," and that one cannot determine what the best value at the transactional stage would have been because the price arrived at in the first stage was higher than it should have been.[100] He argues that if the government "knew the floor in the first stage," there is more room to negotiate in the second stage. He claims that when SMS submitted an invoice for payment at the transactional stage, the price on that invoice was "infected" by the price that was obtained at step one of the process. He can prove the "infection" if the false statement pertains to price, because any statement regarding price has a natural tendency to mislead.[101]

Because a "best value" analysis, which the government applies at the transactional

---

[100] Def.'s Br. in Support of MSJ at 23-24; MSJ Tr. at 8-9.

[100] Rel.'s Supp'l Mem. in Opp'n to MSJ at 2-4.

[101] MSJ Tr. at 11, 13, 18, 32, 53-54, 58, 65, 72, 77-78.

stage, necessarily starts from the contract price, it is possible that if a contract award contains lower discounts than the government would have obtained absent the fraud, this could affect the final, negotiated transactional price.  However, before reaching this issue, Thomas must show that a knowingly false, material statement or omission caused VA to award a contract with a lower discount than it otherwise would have obtained.

### Specific Schemes and False Statements

Thomas alleges that in its DPI responses to VA solicitations for capital medical equipment contracts and in its responses to the audits of those solicitation responses, SMS made false representations by omitting greater discounts it had given to non-governmental customers.  He contends that SMS was required to disclose on its DPI forms *all* discounts it gave to non-governmental customers, including discounts given at the transactional level.[102]  More specifically, he contends that SMS failed to disclose discounts it had given Broadlane and other GPOs that were greater than what SMS had stated on the DPI forms; and it failed to disclose its highest discounts in the course of an audit.  He also alleges that in its effort to deceive the government, SMS failed to identify and produce several contracts it had with Broadlane.

### *SMS's Alleged Schemes*

Thomas alleges that SMS tried to hide information about higher discounts it had given to non-governmental customers by "engag[ing] in a studied practice of trip, stumble and delay in responding to the Government's inquiries regarding the sale of CME to

---

[102] MSJ Tr. at 51-52, 72; Rel.'s Supp'l Mem. in Opp'n to MSJ at 1 & n.1.

commercial customers."[103]  As evidence of this deception, he points to what he contends is SMS employees' awareness that their "lack of candor" in dealing with the government "exposed them to risk."[104]

Thomas contends that once "caught" and forced to disclose the higher discounts during the audit process, both Acuson and SMS employed a scheme using pretextual codes in sales data to falsely justify, often after the fact, why the discounts to commercial customers were greater than those being offered to the government.  At Acuson, the scheme used "Y Codes."  At SMS, the vehicle was called "justifications."

Thomas also alleges that SMS falsely induced the government to enter into these contracts by calling the government its "most favored customer" and falsely promising to give the government its "best price."  He asserts that his "best price" theory is not based on SMS's contractual obligation to give the government its best price, but on its false promise to give the government its best price in order to induce the government to award it contracts.

SMS counters that there are no facts from which one could reasonably infer that SMS knowingly submitted any false statements to the government.  It contends that the undisputed facts show that the DPI did not have an unambiguous plain meaning and that VA accepted multiple interpretations of the disclosures required and did not require SMS, Acuson or any other vendor to complete the DPI in any particular manner.  SMS argues that it completed the DPI with its understanding that the DPI required disclosure of the

---

[103] Rel.'s Resp. Br. at 19 n.30.

[104] *Id.* at 20.

highest *comparable contractual* discounts, while Acuson interpreted the DPI as requiring disclosure of the highest *comparable transactional* discounts.[105]   According to SMS, disclosure of the best comparable contract discounts it gave to private customers was acceptable because there were no specific instructions on how to complete the form and to disclose discounts.

SMS explains that discounts given as part of group buys, which SMS entered into with Broadlane and other GPOs, are not comparable to the contractual or transactional discounts negotiated with the government and other non-GPO purchasers.  Group buys are a means of aggregating buyers of CME in order to secure higher discounts from a vendor.  These arrangements involve a commitment to buy off of a limited list of specific, fixed-configuration packages of CME at a set price in a short period of time.  They often include sole-source agreements, obilgating all of the GPO's members to purchase covered equipment solely from that vendor within a period of time, and "committed" or "compliant" agreements, requiring members to purchase a minimum volume of equipment or a certain percentage of their buying needs from a single vendor. SMS's transaction costs and risks for the sale of CME offered in a group buy are lower than those for the sale of CME to the government.  First, because there is only one stage of price negotiation for a group buy as compared to the two-tier negotiation process when selling CME to the government, SMS spends less time negotiating for a sale.  This also reduces SMS's risks of losing the sale because it does not need negotiate again at a transactional stage.  Second, because the group buy aggregates buyers, SMS does not have to negotiate each configuration and its

---

[105] For an explanation of the difference between contractual and transactional discounts, see the section on the contracting process, *supra* at 7-8 & n.12.

respective price with each individual buyer, also resulting in less negotiation time.  Third, because a Group Buy is limited to a discrete number of system configurations, there is more certainty and predictability in the production process, reducing the cost of manufacturing.  Finally, IDIQ contracts never impose a quantity commitment and are in effect for a longer period of time than group buys.[106]

SMS adds that because VA never informed SMS that it was completing the DPI incorrectly and still awarded it the three contracts after two full audits and one full review of its disclosures, incorporating the final DPI submission into the respective contracts, SMS could not have *known* that its DPI was false or incorrect.  In other words, having learned during the audits how SMS treated the discounts for disclosure purposes, VA implicitly accepted SMS's interpretation of the DPI requirements.

SMS also contests each alleged false statement or omission that Thomas alleges was made.  Alternatively, it argues that even if there is a factual issue as to the truth or falsity of any statements made or omitted, Thomas has not proffered sufficient evidence to show that any of the statements or omissions was material to VA's decision to award the contracts or that VA relied on, or was misled by, the purportedly missing or false information.  Put another way, it contends that Thomas was required, but failed, to produce affirmative evidence to show that SMS's alleged promises to give the government the "best price" and its omissions of higher discounts actually induced VA to award the contracts at issue.

SMS argues that Thomas has introduced no evidence, fact or expert, showing that

---

[106] SMS's Statement of Undisputed Facts, ¶¶ 22-23, 78, 101.

any purported false statements or omissions caused VA to enter into the contracts at inflated prices.  Nor has he produced evidence that the contracts resulted in inflated prices at the point of sale of CME.  VA applied an individualized "best value" determination when it separately negotiated the price on each CME purchase *after* the contract was awarded, that is, at the second tier, transactional stage.  A "best value" determination involves consideration of many factors other than contract price.  SMS contends that VA actually received discounts on CME that were *greater* than those in the contract.  Because Thomas did not take discovery of the government on the relationship between the alleged false statements and the prices that the government would have negotiated had VA had the correct information, SMS contends that he has not met his burden to show loss causation.

*Scheme to Withhold Damaging Information from the Government*

In support of his allegation that SMS tried to keep damaging information about SMS from the government, Thomas points to two emails VAOIG sent to SMS in connection with two audits – one of the CT/MR contract and the other of a contract not at issue – and an email string between SMS employees regarding production of documents in connection with an audit of another contract not at issue.  In the first email from VAOIG, sent on May 13, 2002 in connection with a solicitation not at issue (No. M6-Q1-01), Brenda Lindsey, a management analyst at VAOIG's Office of Contract Review, stated that she was "still awaiting the spreadsheet with the explanations for those discounts that are higher than what is offered to the government."[107]  In VAOIG's second email, sent on June 26, 2002, Brenda Palmatier, another management analyst at VAOIG's Office of Contract Review,

---

[107] Rel.'s ex. 75.

noted that SMS had missed several deadlines for producing sales data in connection with the CT/MR pre-award audit.[108]  In the email string between Kathy Sasala and Les Friend, SMS employees,[109] Sasala wrote that she did not want to spoil the birthday of another employee because VAOIG told her that if required, it would obtain a "friendly subpoena" in order to get copies of SMS's contracts with GPOs.  Friend's initial response was: "Kathy you are going to love Leavenworth."[110]

The emails from VAOIG show nothing more than a delay in responding.  They do not establish, directly or indirectly, that SMS concealed or ultimately failed to produce information about CME sales.  Nor is there any evidence that SMS withheld information from the government that was material to its decision to award a contract that it otherwise would not have awarded.  The emails between Sasala and Friend were comments about documents pertaining to an X-Ray equipment audit of a proposal for a contract that is not at issue.

Indeed, it is undisputed that SMS sought to comply with VAOIG's request for information.  Friend directed Sasala to provide copies of the GPO contracts to VAOIG, with confidential names redacted, obviating the need for VAOIG to have to issue a "friendly subpoena."  Thus, any implication that SMS withheld the requested information is not supported by any evidence, direct or indirect.

---

[108] Rel.'s ex. 63.

[109] Sasala was a contract specialist in SMS's government accounts department, and Friend was a vice president for SMS's Southeast region.  *See* Rel.'s Resp. Br. at 4 n.3. and 20 n.31.

[110] Rel.'s ex. 87.

*Y Codes Scheme*

According to Thomas, "Y Codes" were pretextual codes used by Acuson in its sales data to justify higher discounts given to certain customers rather than others, especially the government.[111]  They were used to explain why the higher discounts were given to those other customers by fabricating qualifying conditions to justify the difference.  Thomas alleges that the use of Y Codes was SMS's "primary device to explain away the greater discounts accorded commercial customers (versus the government)."[112]

In the 1990's, Acuson faced "enormous pricing pressure" from the prevalence of discounting and increases in discount rates by competitors.[113]  Thomas contends that, on one hand, sales representatives were motivated to book as much sales revenue as possible without regard to profit margin and, on the other hand, management wanted to control discounts to improve profit margins.  One way to minimize discounts was to prevent customers, especially the government, from learning about higher discounts given to other customers.[114]

To support his Y Codes theory, Thomas relies on the following: (1) his own affidavit; (2) the Declaration of Don Birdsey, who, from 1989 to 2001, was a sales representative and regional sales manager for the sale of ultrasound equipment, first at Acuson and then

---

[111]  Thomas alleges that SMS continued Acuson's practice of using Y Codes by employing "justifications" in its sales data.

[112]  Rel.'s Resp. Br. at 23 (citing Thomas Aff., ¶ 20 and Birdsey Decl.); Rel.'s ID of False Statements, ¶ C.1.

[113]  Hibbits, who was Director of National Accounts at Acuson, testified that the reason for the "enormous amount of pricing pressure" was that Acuson's ultrasound system cost two to three times more than other systems because it was the first computerized system in the industry.  Hibbits dep. at 140-41, 163.

[114]  Rel.'s Resp. Br. at 8-10; Rel.'s ID of False Statements, ¶ C.2.

at SMS; (3) the deposition testimony of Victoria Hibbits, a former Acuson employee; and (4) a fax from Ralph Gross.[115]

According to Birdsey, in order to "make the sale," he and other salespersons were giving higher discounts to large commercial customers than to the government. Hibbits instructed them to use Y codes at Acuson, called "justifications" at SMS, to conceal from the government that private customers were getting better pricing. Sales personnel were directed – often after a sale was finalized and the equipment had been delivered – to ask Acuson's "Quote Department" to "create another, backdated quote . . . that would include a specified 'Y code.'"[115]   Neither the sales quote nor the terms of sale were changed. Rather, according to Thomas, the Y Code was a false explanation for why the discount was given in order to rationalize why it was higher than that given the government. Often the customer receiving the discount was not aware of the stated reason or justification for the discount. Additionally, Acuson sales personnel were instructed to use Y Codes more often in anticipation of and in connection with government audits.[116]

Hibbits and Bertrand, SMS's 30(b)(6) witness, explained the evolution of Acuson's use of Y Codes. The practice was developed to explain to a third-party information vendor, MD Buyline, why the terms and conditions for CME sales to commercial and non-commercial customers were not identical. Third-party information vendors, like MD Buyline, provide to its subscribers, individual hospitals, information needed to purchase medical equipment meeting the buyer's particular technical, clinical, economic and other

---

[115] Birdsey Decl. (Nov. 4, 2010); Thomas Aff. (Nov. 4, 2010), ¶ 20; Rel.'s ex. 57.

[115] Birdsey Decl., ¶¶ 1, 4-8.

[116] *Id*.; Thomas Aff., ¶¶ 6-7, 9-10.

requirements at the best price.  In exchange for its services, MD Buyline required its clients to provide it with the quote and final purchase order with respect to each purchase of CME. MD Buyline compiled and sold this data.[117]

MD Buyline sold Acuson's and other vendors' transaction data, listing each vendor's last thirty transactions, including the discounts given.  The highest discount listed became "the new floor" price which MD Buyline would recommend that its clients demand from that seller.  In earlier years, the listing did not account for variables that affected the size of the discounts.  The reported prices did not explain why one customer was given a higher discount on the same or similar equipment than that given to another customer.  For example, some of the discounts were given due to trade-ins, different number of systems purchased, promotionals, fourth quarter opportunities and luminary sites.[118]

Acuson asked MD Buyline to stop reporting pricing information without sufficient detail to distinguish one discount from another.  By late 1991, MD Buyline agreed to report why certain discounts were given as long as Acuson better detailed its transactions. Consequently, Acuson developed Y Codes in order to give MD Buyline more detailed pricing information to better understand Acuson's various discounts.[119]

Y Codes identified the different types of customers and defined the differences between the terms of the various transactions.  Eventually, they were used for both commercial and government accounts.  According to Thomas and Birdsey, the Y Code

---

[117] Hibbits dep. at 138-48; Bertrand dep. at 58-60, 442-43.

[118] A "luminary" is willing to discuss and recommend the CME to other purchasers at trade shows or educational programs.  Rel.'s ex. 41; Hibbits dep. at 108.

[119] Hibbits dep. at 138-48; Bertrand dep. at 58-60, 442-43.

system was used later at SMS, where they were called "justifications."[120]   Not every transaction received a Y Code.[121]

Thomas acknowledges that there is "nothing inherently improper about creating a system to categorize discount levels based on legitimate reasons" or "anything inherently wrong with having justifications for giving discounts."[122]   Indeed, he himself had provided Y Codes for many transactions.  He claims that when he did, he honestly believed that the customer deserved that particular discount based on a specified Y Code category.[123]

Acuson used the following Y Codes to identify discounts: (1) *Volume* - purchasing more than one product and/or system; (2) *Committed Compliance* - large number of hospitals and facilities within a single medical system committed to buying the CME; (3) *Group Buy* - leader of an affiliation of hospitals enters into a contract with a CME manufacturer, which allows the affiliated hospitals to buy CME at discounted prices "loosely based on the terms negotiated at the group buy"; (4) *Demonstration Site* - customer agrees to provide on-site demonstrations for potential customers to observe how to use the equipment; (5) *Customer Referral Site (Luminary)* - large, nationally recognized customers with clinical expertise willing to discuss and recommend the CME to other at trade shows or educational programs; (6) *Image Acquisition Site* - customers willing to produce images from their use of an imaging product and allow Acuson to use them in their marketing and

---

[120] Birdsey Decl., ¶¶ 3-4, 9.  Although SMS agrees that it provided post-sale explanations to the government regarding the basis for discounts given on various transactions, it does not agree that they were ever called "justifications."  Bertrand dep. at 66-68, 434, 442-43; Hibbits dep. at 137-38; 148-51.

[121] Hibbits dep. at 108, 149.  *See also* Hibbits dep. at 96-98, 108, 138-51; Bertrand dep. at 58-59, 65-68, 434, 436-37, 442-43.

[122] Thomas's Resp. to SMS's Statement of Undisputed Facts, ¶ 20.1; Thomas dep. at 115-16.

[123] Thomas dep. at 174-75, 117.

educational materials; (7) *Educational Site* - customers providing seminars on site to train physicians how to use CME; (8) *R&D Site* - customer does a clinical trial on site and provides feedback to seller on product; (9) *Extended Warranty and Service Options*; (10) *Trade-ins* and Used Equipment; (11) *Promotions*; (12) *Fourth Quarter Opportunities*; (13) *Payment of Administrative Fees*.[124]

Thomas admits that while at Acuson, he offered customers discounts based on the first nine of these Y Codes, and that competitors in the industry offered discounts on the same basis.[125]   He considers these legitimate reasons for giving an additional or higher discount. He concedes that based on these Y Code categories, commercial customers frequently received legitimately larger or additional discounts that reduced a product's price to below the price offered the government.[126]

Thomas acknowledges that he had occasionally "inadvertently neglected" to provide a Y Code for a transaction.  Yet, he argues it is improper to correct an incomplete and misleading record of the transaction at a later time.  He inexplicably claims it was wrong for the Quote Department to require him to provide a proper Y Code after the sale had been finalized, even where he had failed to provide one when he should have.[127]  At the same time, he incongruently concedes that if the government requested an after-the-fact justification for the higher discount, there would be "nothing inherently wrong with"

---

[124] Rel.'s ex. 41 (list of Y Codes); Rel.'s ex. 37 (list of "Sales Category Definitions" for different discounts); Hibbits dep. at 143, 148-50.

[125] Thomas dep. at 93-108, 280-82.

[126] Thomas dep. at 147-48.

[127] Thomas dep. at 174-76.

supplying a Y Code for that transaction.[128]

Nevertheless, despite his current position, Thomas admits having provided post-sale justifications for commercial transactions that received discounts higher than offered the government and other commercial customers.  For example, in 2004, Thomas and Larry Hedgepeth were tasked with providing MD Buyline with actual post-sale explanations for certain high discounts SMS had provided to MD Buyline members. Specifically, Thomas had to determine whether discounts SMS had previously given to certain members of MD Buyline were justifiably higher than discounts being offered later to other MD Buyline members.[129]  Thomas provides no explanation for his conflicting opinions.

In support of his allegation that Y Codes were pretextual, post-sale explanations for giving non-governmental customers higher discounts, Thomas points to two circumstances where, in his view, employees of Acuson and SMS were unable to come up with a legitimate Y Code or justification for the higher discount.  Specifically, he contends that in October of 2004, Kristy Carpenter, National Accounts Manager for SMS's Acuson Division, told Thomas that she was involved in a VA audit of the Division's ultrasound equipment sales and that she was "hard-pressed to explain to the government why over 85% of the division's sales to private customers contained discounts that exceeded those given to the government."[130]  She told him she was "using the usual Y Codes" to explain the higher discounts.[131]

---

[128] Thomas dep. at 152-53.

[129] Def.'s ex. 5 (Aug. 13, 2004 email from Larry Hedgepeth); Thomas dep. at 682-83.

[130] Thomas Aff., ¶ 20.

[131] *Id.*; Rel.'s Rep. Br. at 16.

Even if Carpenter's statements related to a contract at issue, they do not show that Acuson made any false statements.  Just because Carpenter may have been "hard pressed to explain" the higher discounts does not mean that there was no valid explanation for them.  Nor does her "using the usual Y Codes" mean that they did not apply to each transaction to which she assigned them.  Nothing in her comments can be construed as meaning that the codes did not accurately and truthfully explain the reason for each higher discount.

The second circumstance Thomas cites is in connection with the 2002 CT/MR audit, where, in response to VA's request for commercial CT transaction sales data, an SMS employee told another employee that he "would not be able to prove special conditions for every order."[132]  SMS argues that this statement made by one SMS employee does not show that another SMS employee would not be able to provide the special condition for each order, or that a special condition did not exist for every order.

This communication between two SMS employees does not prove that the discounts were unjustified or inexplicable.  The employee was directed to examine notes on the purchase order in SMS's SAP data system to find the explanation for the discounts.  He was not instructed to fabricate reasons for them.  Additionally, there is no evidence that the information was not ultimately located and provided.  Finally, there is no evidence that the codes used were fabrications.

### SMS's Alleged False Statements

We shall now address each of the false statements that Thomas alleges SMS and

---

[132] Rel.'s ex. 64 (July 3, 2002 email string between Arne Grafweg and Les Friend); Rel.'s ID of False Statements, ¶ C.3.

Acuson made in violation of the FCA.

False Statements on the DPI and in the
Pre-Award Audit for the Acuson Ultrasound Solicitation[133]

Thomas contends that VAOIG's questioning several of Acuson's explanations for higher discounts given to certain customers in the course of the Acuson ultrasound audit proves that Y Code justifications were pretextual.  He points to the DPI for the ultrasound solicitation in which Acuson offered VA a 43% discount on Sequoia and Aspen ultrasound equipment.[134]  Acuson reported on the DPI that, except for Kaiser and Tenet, Acuson did not "have in effect, for any customer or any class, discounts . . . which result in lower net prices than those offered the Government in this offer."[135]  When the transactional data produced in the audit showed that Acuson had given discounts on Sequoia equipment ranging from 45% to 56%, and discounts on Aspen equipment ranging from 45% to 59%, VAOIG asked Acuson to provide it with reasons for the discrepancies between those discount levels and the 43% offered VA.  Acuson's explanation was that those customers who had received the higher discounts were participating in a "Partnership Program" with Acuson, such as agreeing to be a demonstration, customer referral, image acquisition or educational site.[136]

---

[133] Rel.'s Resp. Br. at 26-27; Relator's ID of False Statements, ¶¶ A.4, A.5, C.

[134] Def.'s ex. 29 at Bates 217239.

[135] *Id.* at Bates 217240.

[136] Rel.'s ex. 57 (April 10, 2001 Fax from Ralph Gross to P.J. Ryland enclosing draft VAOIG report) at Bates 214638-69.  Also in connection with the Acuson ultrasound audit, a few weeks earlier VA had asked Acuson to explain why Educational Institutions were receiving a 48% quantity discount – which Acuson listed on page 4 of its DPI – and how VA could be eligible for this higher discount.  Acuson responded by explaining that these customers agreed to be a demonstration, customer referral, image acquisition or educational site. *See* Def.'s exs. 29, 38, 39.

VAOIG then sought to conduct a survey of ten commercial customers who received higher discounts, contacting four of them.   Representatives of all four customers told VAOIG that they had not signed an agreement to be part of any "partnership" program with Acuson and had not yet performed any tasks necessary to be part of the program.   Two denied any awareness of being in the partnership program at all.[137]

In its draft audit report, VAOIG concluded: "We believe that the programs mentioned above are sales strategies to increase the sales officials' accounts. . . . Based on our conversations with the [four] customers, we concluded that they were not performing any duties that would make them non-comparable to the Government."[138]

The undisputed evidence demonstrates that VA could not have been misled by Acuson's allegedly inadequate disclosures in the DPI and the pre-award audit.   The issues were fully reviewed by and resolved with the VA contracting officer prior to the contract award and after accepting Acuson's revised disclosures, which Thomas does not contend were deficient or false.   On April 10, 2001, Ralph Gross, the VA contracting officer, faxed excerpts of VAOIG's draft audit report to Ryland, who managed Acuson's contracts with the government for ultrasound products and submitted Acuson's DPI response to VA's ultrasound solicitation.   Gross characterized the auditor's findings as determining that the "Discount and Pricing Information [on] page 3 was *not* accurate[,] complete or current."[139] He then noted that Acuson gave several commercial customers discounts as high as 56% on Sequoia products and 59% on Aspen products, as compared to the 43% discount

---

[137] Rel.'s ex. 57 at Bates 214639.

[138] *Id.*

[139] *Id.* at Bates 214637 (emphasis in original).

offered VA.  He referred Ryland to the auditor's response to Acuson's rationale for giving higher discounts to commercial customers.[140]

In the same fax, using the information in the draft audit report, Gross then negotiated with Ryland.  Gross demanded greater discounts, stating: "Taking the middle of the discounts offered [to Acuson's commercial customers and the government, VA] needs to have the discounts for Sequoia increased to 48% and the Aspen to 50%."[141]  The next day, Acuson submitted an amended DPI, this time offering a 48% discount on both Sequoia and Aspen systems.  Three weeks later, as a result of the negotiations, VA awarded Acuson the ultrasound contract, with the 48% discount on both the Sequoia and Aspen systems.[142]

When informed of VAOIG's findings about Acuson's commercial customers' denial of participation in the partnership programs, Acuson disputed VAOIG's conclusions. It explained to VAOIG that it had contacted the wrong people at the four customer sites. Acuson gave VAOIG different contact information identifying people at each customer site who were familiar with the company's participation in the partnership programs.[143]

Whether VAOIG contacted the four commercial customers using the new contact information is not relevant to our inquiry.  If VAOIG contacted the four persons identified by SMS, it either did or did not confirm that the customers participated in the partnership

---

[140] *Id*.

[141] *Id*.

[142] Def.'s ex. 47 (April 11, 2001 letter from P.J. Ryland to Ralph Gross enclosing amended Acuson ultrasound DPI); Def.'s ex. 19 (amended Acuson ultrasound DPI); Def.'s ex. 12 (2001 Acuson Ultrasound Contract Award).

[143] Hibbits dep. at 157, 162-63; Bertrand dep. at 556-60.

program.  If VAOIG did not contact them, Gross relied on the auditor's draft report, which concluded that the customers did not participate in the program.  Either way, when Gross negotiated the contract, he had the information he considered necessary.

Basing his negotiating position on VAOIG's findings, Gross negotiated new discount terms in his letter to Acuson, which enclosed the draft auditor's report.  Although Gross knew that the auditor had determined that the DPI was "not accurate, complete or current," and that, in the auditor's view, customers who were receiving higher discounts than the offer made to VA were not performing any duties that would make them non-comparable to the government, he still engaged in a typical post-audit negotiation.  Knowing that Acuson had given a 56% discount on Sequoia products and 59% on Aspen products, as compared to the 43% discount offered VA in the initial DPI, Gross did not demand the highest discount rate Acuson had given other customers.  Instead, he took the "middle of the discounts offered."[144]  Acuson responded to the counteroffer the next day, offering a higher discount than in its original DPI, but a lower discount than Gross demanded.  Three weeks later, the contract was awarded on the terms of Acuson's last offer.[145]

What Gross did was consistent with how the typical audit and negotiation process between VA and a commercial vendor works.  As Regan explained:

> Pre-award reviews of proposals are performed by OCR at the request of VA contracting officers. During the pre-award review, vendors are required to produce commercial sales transaction data and other information . . . . [which] was used to determine whether the disclosures included with the

---

[144] *Compare* Sequoia 56% commercial customer rate *with* 48% rate demanded; and Aspen 59% commercial rate *with* 50% rate demanded.  *See* Rel.'s ex. 57.

[145] This negotiating strategy confirms that the "most-favored customer" standard did not apply to this type of contract.

> proposal were accurate, current, and complete. The information is used by OCR to determine if the prices being offered are fair and reasonable and to make recommendations to the contracting officer for use during negotiations.
>
> It is not uncommon for the pre-award review to find that the information contained in the proposal was not accurate, current, or complete. . . .[146]

As part of the process, OCR examines the vendor's disclosures of commercial sales transaction data to: (1) determine whether the DPI was accurate, current, and complete; (2) determine whether prices being offered are fair and reasonable; and (3) make recommendations to the contracting officer for negotiations to obtain a fair and reasonable price. That is precisely what Gross and the VAOIG auditor did. The fact that the auditor determined that the DPI was "not accurate, complete or current" does not render the vendor's disclosures false. Pursuing a typical post-audit negotiation strategy, Gross began negotiating a better price immediately after the auditor informed him that Acuson's disclosures were "not accurate, complete or current."

Regan confirmed that the negotiating process in which the government and Acuson engaged was typical with respect to the 2001 Acuson ultrasound pre-award audit. She stated that the transactional sales data Acuson produced in support of the offer to VA "showed that discounts offered to commercial customers were greater for all product lines than those being offered the Government."[147] She explained that the pre-award review "also included an in-depth review and analysis of programs that Acuson represented

---

[146] Regan Decl., ¶¶ 7-8.

[147] Id., ¶ 11.

73

distinguished VA from commercial customers who received larger discounts."[148]   Regan
then concluded that:

> the pre-award review[] provided the respective contracting
> officer[] with information and analysis regarding the
> commercial sales practices for . . . Acuson with specific
> recommendations to the contracting officer[] that identified
> discounts that [he] should seek to obtain during contract
> negotiations. The discounts recommended were not always
> equal to or better than the MFC discounts the vendor[] offered
> [its] commercial customers.  Once a contracting officer has the
> information, analysis, and recommendation provided by the
> pre-award review, he or she has the authority to negotiate and
> reach agreement with the vendor on contract pricing.[149]

Aware of all of the facts that Thomas asserts were fraudulent, the government has

made it clear that VA had not been misled and cheated.  Counsel for the government

stated:

> Insofar as the allegation is that the government entered into a
> contract under some misapprehension or under some kind of
> fraudulent circumstance, that doesn't appear to be the case
> because those contracts were audited. . . . The government
> had the information that it wanted when it entered into the
> terms of the contract."[150]

At the time it awarded the contract, VA was aware that the transactional sales data

produced by Acuson in support of its offer to VA revealed higher discounts offered to

commercial customers than were being offered the government.

Additionally, after conducting "an in-depth review and analysis of programs that

Acuson represented distinguished VA from commercial customers who received larger

---

[148] *Id.*

[149] *Id.*, ¶ 12.

[150] *See* Tr. of Hr'g on Order to Show Cause Why Thomas Should Not be Disqualified as a Relator
(Dec. 14, 2010) at 227.

discounts,"[151] VAOIG concluded that: (a) Acuson's DPI was "not accurate, complete or current"; (b) the customers with higher discounts were not, in fact, "performing any duties that would make them non-comparable to the Government"; and (c) the Partnership Programs cited by Acuson as the basis for the higher discounts were actually "sales strategies to increase the sales officials' accounts."[152]  Nonetheless, VA continued with the negotiation process, ultimately reaching an agreement with Acuson based on pricing terms between Acuson's original offer and the highest discount Acuson gave its comparable commercial customers.

At oral argument on SMS's motion for summary judgment, Relator's counsel asserted, for the first time, that the audit for the Acuson ultrasound contract was "preliminary," "stopped in midcourse," and never completed.[153]  He offered no evidence to support this argument.  In fact, Regan confirmed that a final pre-award audit report of the Acuson ultrasound solicitation was issued on July 10, 2001.[154]

Thomas's counsel further argued that even if the audit had been completed,[155] the evidence still shows that the government was cheated because the Acuson U/S contract

---

[151] Regan Decl., ¶ 11.

[152] Rel.'s ex. 57 at Bates 214637, 214639.

[153] MSJ Tr. at 19-20, 26-28.

[154] Regan Decl., ¶ 9.  *See also* Def.'s ex. 22 at Bates 000211132 (VAOIG Semiannual Report to Congress covering Apr. 1 - Sept. 30, 2001, listing final audit report date for Acuson ultrasound solicitation as July 10, 2001).

[155] When asked why he did not have the final audit report, Thomas's counsel stated that he did not request the government to produce it during discovery because he "didn't think [the relator] needed it."  MSJ Tr. at 25, 30.  Subsequently, Thomas tried to blame SMS for the lack of production of the audit reports.  *See* Rel.'s Supp'l Mem. in Opp'n to MSJ at 5 n.4 (complaining that SMS has "not produced any evidence relating to the nature of the government audits").  But, as Thomas's counsel concedes, it is the relator's burden to prove his allegations.  MSJ Tr. at 65.  Additionally, the government, not SMS, is in possession of the final audit reports.

was awarded before the audit was finalized,[156] and the final audit did not uncover specific discounts that SMS improperly failed to disclose.[157]  But, Thomas has not identified any higher discounts that were not disclosed or discovered during the course of the audit that would have affected the contracting officer's award decision.   The only undisclosed discounts that Thomas points to, which were identified by his damages expert, pertain to the SMS CT/MR audit, not the Acuson ultrasound audit.[158]

In sum, there is no evidence that any of Acuson's disclosures or omissions in its DPI or during the pre-award audit were false.  Nor has Thomas produced any evidence that VA was misled into awarding Acuson the ultrasound contract.  Although the record reveals that VAOIG initially questioned Acuson's explanations for why some commercial customers were receiving higher discounts than what Acuson offered VA, Thomas has adduced no evidence showing that the omitted information regarding the higher discounts on the DPI or Acuson's providing allegedly false reasons for the larger discounts had any effect on VA's ultimate decision to award the contract after additional facts became known.  Without any testimonial or documentary evidence that VA's contracting officer was not provided the information he required and that additional disclosures would have affected his negotiating position and enabled him to have negotiated a higher contract discount than actually obtained, the original DPI alone cannot support a false claim under the FCA.   On the contrary, the only evidence bearing on materiality and reliance is the Regan declaration

---

[156] Although the Acuson U/S Contract was awarded before the final audit report was issued, the contracting officer had the authority to cancel the contract if the final audit report contained information that would have negatively impacted his award decision.  Regan Decl., ¶ 12.

[157] MSJ Tr. at 20, 24, 39-40, 44-45; Rel.'s Supp'l Mem. in Opp'n to MSJ at 5 & n.4.

[158] Johnson Rep., ¶ 39.

that undisputedly establishes that VA neither relied on nor was misled by false information in the DPI or the audit.  Thomas has not produced any evidence that disputes or tends to dispute Regan's statements.  Thus, there is no genuine issue of fact from which a reasonable jury could conclude that the government relied on and was misled by the information SMS supplied.

### False Statements on the DPI for the SMS NM Solicitation

Thomas asserts that SMS "lied" when it represented on its DPI for the NM solicitation that its highest discounts to non-governmental customers was a 56% "Regular Discount" because SMS had given Broadlane a 66% discount on the same equipment.[159]

On its NM DPI, SMS identified its October 2002 "catalog/pricelist" as the basis for its offer to VA.[160]  In its answers to the NM DPI Questions 4.a and b, SMS disclosed that it had in effect discounts higher than the 60% discount it was offering the government.  The questions and answers were:

4. Discounts

a. Discount offered for Product Line . . . is <u>60%</u> from price list indicated in #2 above. . . .

b. Do you have in effect, for any customer or any class, discounts and/or concessions, including but not limited to the following, regardless of price list, which results in lower net prices than those offered the government in this offer?

Yes __ No _X_ rebates of any kind, including year-end or end of contract

*Yes _X_ No __ multiple quantity unit pricing plan

---

[159] Rel.'s Resp. Br. at 17; Rel.'s ID of False Statements, ¶¶ A.2., A.10; Rel.'s ex. 23.

[160] *See* Rel.'s ex. 28 at Bates WT004618 (SMS's answer to NM DPI Question 2.a).

Yes __ No  X  cumulative discounts of any type which cover items offered

Yes __ No  X  products that may be combined for maximum discounts

*Siemens does offer multiple quantity unit pricing plans to customers or any customer class when a minimum volume quantity is committed to be purchased. Value may range from 1% to 5% additional discount from list price depending on the commitment made by the customer class.[161]

Ignoring SMS's answer that it had given the above discounts, Thomas attacks SMS's answer to Question 4.c, which asked:

c. List below the best discount, *using percentages*, and/or concessions (regardless of quantity and terms and conditions) to other than the Department of Veterans Affairs from the price list in #2 above. If Not Applicable, please indicate N/A for the category.

A table of customer categories and types of discounts follows this question, where the applicant must report the "best discount" from its "price list" that it offers to private hospitals, educational institutions, governments, original equipment manufacturers and buying groups in six different discount categories: regular discount; quantity discount; aggregate discounts; prompt payment; FOB point; and other.  In its response, SMS listed 56% as its highest "regular discount" to someone other than VA.[162]

SMS properly did not list the 66% discount to Broadlane.  SMS documents created at the time of the solicitation response indicate that the 60% contract discount offered to the VA was the highest comparable commercial discount SMS offered.[163]  Broadlane's

---

[161] Rel.'s ex. 28 at Bates WT004619.

[162] Rel.'s ex. 28 at Bates WT004620.

[163] See Def.'s ex. 90.

prices were configured differently than VA's because they were part of a group buy, where all of Broadlane's member entities had to purchase off of a limited list of fixed-configuration packages of NM equipment at a set price, and they had to purchase these items solely from SMS within a short time period.  Consequently, instead of having access to SMS's full catalog/price list of equipment, the group buy members were restricted to purchasing NM systems on the group buy list and could not upgrade or purchase accessories beyond those expressly listed.  In contrast, SMS offered VA a percentage discount off of SMS's full catalog of NM CME, without restrictions or limits on which systems and accessories VA could purchase.   Thomas agrees that Broadlane group buys differ from government contracts.[164]

The only configuration for nuclear imaging CME that SMS sold to Broadlane that had an effective discount rate close to 66% was the configuration for the E. Com Variable Angle System, which had an effective discount rate of 64.69%.  To account for these different configurations, SMS disclosed in answer to Question 4.b that it had "in effect, for any customer or any class, discounts, . . . *regardless of price list*, which results in lower net prices than those offered the government in this offer." (emphasis added).  Responding to question 4.c, which asks for the "best discount" "from the price list," SMS did not list the Broadlane discount because members of that group buy were not permitted to purchase CME off of SMS's full catalog/price list of NM CME.  In other words, no percentage

---

[164] *See* Thomas dep. at 231:3-20 ("A Broadlane committed group-buy contract is worth its weight in gold.  That is because it involves large hospital systems (Tenet, KP, HAGC and UHS), where they are committing 100 percent of their purchases from one to two years.  You either win it all or you're shut out in the cold.").

discounts were given off of a catalog/price list like they were for VA.[165]   Therefore, because the response was correct, SMS's representation that its highest discount to non-governmental customers was a 56% "Regular Discount" cannot be deemed a false statement.

False Statements on the DPI for the CT/MR Solicitation

*MR CME*

Thomas claims that SMS lied when it represented on its DPI for the 2002 CT/MR solicitation that its highest MR CME discount to a non-governmental customer was 35% when, in fact,  Broadlane received a 50.5% discount on that same equipment.[166]   He relies on a pricing sheet for a specific group buy configuration connected to a Broadlane Committed MR Group Buy, which refers to a discount given to Broadlane in connection with a group buy in 2003.  The specific transaction covered a Magnetom Symphony 1.5T with Sprint Gradient, which was quoted on March 10, 2003.[167]   The DPI for the MR solicitation was submitted between March 12, 2002 and April 12, 2002, and the MR contract was awarded to SMS on September 19, 2002.[168]  Therefore, SMS's disclosures to VA regarding MR CME had occurred *prior* to the discount quoted to Broadlane.

There is no obligation to forecast or predict a discount the vendor might give or contemplates giving in the future.  Similarly, the vendor is not required to give the

---

[165] Def.'s exs. 10, 23, 90, 99, 100, 120, 131; Rel.'s exs. 28, 40, 67.

[166] Rel.'s ex. 19 (SMS MR DPI) at Bates WT00543; Rel.'s ex. 21 (Broadlane Committed MR Group Buy agreement); Rel.'s ID of False Statements, ¶¶ A.4, A.5, A.11.

[167] Def.'s ex. 121 at Bates WT000555 (Ex. 5 to the SAC).

[168] Rel.'s exs. 19, 35.

government a discount on future deliveries under an existing contract when it gives a greater discount to a non-governmental customer after the date of the government contract.  In her declaration, Regan explained that even if the vendor offers a higher discount to a non-governmental customer during the life of a direct delivery contract, such as the CT/MR contract, the vendor is not required to offer VA price reductions during the term of the contract.[169]   Thus, because it is undisputed that the Broadlane discount postdated the MR DPI, there is no false statement in the DPI.

*CT CME*

Thomas claims that SMS lied when it disclosed on its DPI for the CT solicitation that the highest CT CME discount it was giving to a non-governmental customer was 32%. According to Thomas, SMS had given Broadlane a 42% discount on that equipment.[170]

As explained earlier, the VA and the Broadlane contracts were not comparable and the pricing schemes were different.  Broadlane's prices were part of a group buy and were fixed differently than VA's.[171]

More importantly, the only Broadlane configuration that received a higher effective discount than 32% was for the Somatom Volume Zoom, which had an effective discount of approximately 42%.[172]   But, SMS did not offer this product in response to the CT/MR

---

[169] Regan Decl., ¶ 6.

[170] Rel.'s ex. 33 at Bates 000334 (SMS CT DPI); Rel.'s ex. 26 (Sept. 1, 2001 Agreement for CT Scanners Between Broadlane and SMS); Rel.'s ID of False Statements, ¶¶ A.4, A.5.

[171] As explained *supra* at 5, in IDIQ contracts, the price is fixed at a level negotiated below specified catalog or list prices.

[172] The 42% effective rate comes from the difference between a list price of $1,514,364 and a net price of $875,000 ($639,364/$1,514,364 = 42%). Rel.'s ex. 25 (internal Broadlane document).  This price was offered to Broadlane in August of 2001, whereas the SMS CT DPI was disclosed in March 2002.

solicitation. Nor was this product in the CT/MR contract.[173]  Consequently, this item was not comparable to the CME that SMS was offering to sell to VA.  Thus, SMS's failure to list the 42% discount to a non-governmental customer for a product not covered by the solicitation and the contract cannot constitute a false statement.[174]

In any event, the government was aware, at the time it negotiated the contract, that SMS gave discounts higher than 32% to commercial customers.  In connection with the CT/MR pre-award audit, SMS disclosed that many of its discounts to commercial customers were higher than 32%.[175]  Even assuming VA did not know about the specific 42% discount given to Broadlane on the Somatom Volume Zoom, Thomas has not proffered any evidence that VA would have negotiated a lower price had it known about that particular discount on a product SMS did not offer to VA.  In other words, any discount for this product is not relevant to negotiating the price of dissimilar CME.

Therefore, because there is no evidence that such a disclosure would have affected VA's negotiating position and its decision to award the contract, the failure to disclose a higher discount on non-comparable equipment does not constitute a false claim under the FCA.

---

[173] *See* Rel.'s ex. 33 at Bates 000333 (SMS CT DPI) (listing only Somatom Balance, Somatom Balance and Somatom Sensation 4 CT scanners as products "included in this Discount Schedule"); Rel.'s ex. 35 at Bates 0001306-1308 (Summary of Award for CT/MR Contract).

[174] At oral argument, Thomas conceded that there could be no false claim based on omission of a discount on a particular item of CME if that CME had not been awarded on the umbrella contract, or was not ultimately purchased at the transactional level.  MSJ Tr. at 74-75.

[175] *See* Def.'s ex. 71 (SMS audit disclosures on CT CME commercial accounts).

<u>False Statements in the CT/MR Audit</u>

*Failure to disclose nine sales transactions reflecting greater discounts on CT CME*

Relying on his expert's opinion, Thomas asserts that during the CT/MR audit, SMS failed to disclose nine sales transactions in which SMS had provided discounts ranging from 35% to 43% on CT scanning equipment to non-governmental customers, all of which were higher than the 32% discount offered VA.[176]

Assuming the expert is correct, these few omissions are insignificant.  The discounts were not as great as many other discounts SMS disclosed to VA.  During the CT/MR audit, SMS disclosed many transactions reflecting discounts much greater than 43%.  Specifically, SMS disclosed more than 200 transactions for CT scanner equipment, more than half of which were greater than the 32% contract discount rate offered the government, and some were more than double.   In the numerous communications between VAOIG and SMS personnel, the auditor expressly acknowledged the disclosed higher transactional discounts, including an 89% discount.[177]

Because the nine allegedly omitted discounts were less than many disclosed discounts, they were not material to VA's decision to award the CT/MR contract.  Indeed, Thomas has not shown that VA relied on the alleged omissions.  There is no evidence that

---

[176] Johnson Rep., ¶ 41 and Table 6 (listing nine commercial CT transactions discounted more than 35%).  In conducting his analysis, Johnson used current SAP data, which does not reflect the transaction discounts as they existed at the time of the audit in 2002, but rather as they existed in 2010.  Consequently, any changes to the transaction discounts made between 2002 and 2010 would be reflected in the current SAP data.  Johnson does not dispute this.  Johnson Dep. at 167-68.

[177] *See* Def.'s ex. 74 (July 15, 2002 email from Lindsey of VAOIG to Sasala) (stating that she has "evaluated the transactional data" SMS provided and attaching her own "analysis sheet" reflecting a "9 to 89%" "Range of Discounts in Transaction Data" on CT scanners).  *See also* Regan Decl., ¶ 10 (stating that during the CT/MR audit VAOIG identified "actual discounts given to commercial customers at the time of purchase [that] were significantly higher" than the "contract discounts being offered VA.").

had VA known of the nine transactions reflecting discounts of 35% to 43%, it would have negotiated or insisted upon a lower price.  Nor is there any evidence that VA was misled into awarding the CT/MR contract at the negotiated price.   Therefore, because the discounts on the nine allegedly omitted transactions were lower than a multitude of other discounts SMS disclosed to VA and there is no evidence that the information would have affected VA's decision to award the contract at the negotiated prices,[178] the omission of these nine transactions does not prove fraudulent inducement under the FCA.[179]

*Failure to disclose and produce contracts for CT CME with Broadlane*

Thomas claims that SMS employee Friend lied when, in response to Brenda Palmatier's[180] inquiry during an audit, he stated that "Broadlane/Tenet are not on contract.  The products are sold only through Group Buys."  Thomas contends this statement was false because there was an "Agreement for CT Scanners between Broadlane, Inc. and

---

[178] *See* Regan Decl., ¶ 12 ("[T]he pre-award review[] provided the respective contracting officer[] with information and analysis regarding the commercial sales practices for Siemens . . . with specific recommendations to the contracting officer[] that identified discounts that [he] should seek to obtain during contract negotiations.").  In summarizing Regan's declaration, counsel for the government stated:

> Insofar as the allegation is that the government entered into a contract under some misapprehension or under some kind of fraudulent circumstance, that doesn't appear to be the case because those contracts were audited. . . . The government had the information that it wanted when it entered into the terms of the contract.

Tr. of Hr'g on Order to Show Cause Why Thomas Should Not be Disqualified as a Relator (Dec. 14, 2010) at 227.

[179] Johnson also lists nineteen MR CME sales transactions reflecting discounts greater than the 35% contract discount rate offered the government that SMS allegedly omitted from the CT/MR audit disclosures. Johnson Rep., ¶ 41 and Table 7.  Similar to the CT CME sales transactions, SMS disclosed more than 100 transactions for MR scanner equipment, more than half of which were greater than the 35% contract discount rate offered the government, and many of which were more than double the 35% rate.  *See* Def.'s ex. 70 (SMS audit disclosures on MR commercial accounts).

[180] Brenda Palmatier was a management analyst at VAOIG's Office of Contract Review.

Siemens Medical Solutions USA, Inc., dated September 1, 2001."   He points to a Broadlane spreadsheet listing several contracts between Broadlane and SMS, proving that SMS had at least one contract with Broadlane for CT/MR CME.[181]

Palmatier's request to Friend was as follows:

> Re: #6 - Please . . . provide the requested information in reference to our review of the CT/MRI commercial contracts.
>
> 1. We don't see CT/MRI referenced in the Broadlane/Tenet or the Consorta agreements.  Do those two GPOs have contracts with Siemens for CT/MRI equipment? If so provide the documents.[182]

Friend responded:

> Item Six.
>
> Broadlane/Tenet are not on contract. The products are sold only through Group Buys. Additionally many of the pricing reviews that you selected where [sic] part of special purchases as outlined below under "Sales Category Definitions".
>
>        *          *          *
>
> **<u>Sales Category Definitions</u>**
>
>        *          *          *
>
> **Group Buys:** From time to time, Group Purchasing Organizations may request that the Seller participate in Group Buy programs, whereby Seller provides designated Products to a defined group of participating members at additional discounts (over and above any established contract discounts) for a limited period of time. Typically there is a minimum committed volume of business over the time period.[183]

---

[181] Rel.'s Resp. Br. at 20; Rel.'s ID of False Statements, ¶ A.7; Rel.'s ex. 38 (July 2, 2002 emails between Palmatier and Friend); Rel.'s ex. 37 (July 8, 2002 letter from Friend to Palmatier at Bates 0001708); Rel.'s ex. 24 (Sept. 1, 2001 CT Scanners Agreement between Broadlane and SMS); Rel.'s ex. 43 at Bates 0002703 (Broadlane spreadsheet).

[182] Rel.'s ex. 38.

[183] Rel.'s ex. 37 (July 8, 2002 letter from Friend to Palmatier) at Bates 0001708, 1710.

Thomas asserts that Friend's statement that "Broadlane/Tenet are not on contract" was false.  He points to the testimony of SMS's 30(b)(6) witness, Bertrand, who testified that a group buy is a "specific type of contract" that Broadlane had with SMS.[184]

Friend made no false statements.  He responded to Palmatier's question regarding the existence of a Broadlane/Tenet contract by differentiating between contracts and group buys.  He described the deal with Broadlane as a group buy arrangement and explained how group buys work.  *See* July 8, 2002 letter (describing group buys as when the "Seller provides designated Products to a defined group of participating members at additional discounts (over and above any established contract discounts) for a limited period of time . . . [and] [t]ypically there is a minimum committed volume of business over the time period").  He did not deny that SMS had any deals with or sold CT/MR CME to Broadlane.  On the contrary, he disclosed to VA that SMS sold products to Broadlane via group buys, and VA understood that SMS sold CME to Broadlane.  Whether it is called a contract or a group buy arrangement is immaterial.  Therefore, Friend's statement that "Broadlane/Tenet are not on contract" because SMS's products "are sold [to Broadlane] only through Group Buys" was not false.

The Broadlane spreadsheet that Thomas cites does not prove that SMS had any contracts with Broadlane for CT/MR CME that it did not disclose to VAOIG.  The spreadsheet reflects one "group buy" between Broadlane and SMS for multiple modalities that included CT equipment in effect from March 1, 1996 through December 31, 2004.[185]

---

[184] Bertrand dep. at 633-35.

[185] Rel.'s ex. 43 at Bates 0002710.  The spreadsheet also reflects two other group buys with SMS for CME that did not include CT equipment.

It does not contradict Friend's statement that Broadlane is not on contract because SMS's products are sold to Broadlane only through group buys.

Even if the statement was not correct, it was not material and the VA did not rely on it in awarding the contract.  SMS expressed its view to VA that its group buy arrangements were not comparable to the contracts VA was seeking.  The arrangements were not hidden.  SMS informed VA about the existence of its group buy deals with Broadlane.  VA could have required SMS to produce them.  It did not.[186]

*Failure to disclose higher discounts for CT/MR CME given to Broadlane*

Thomas claims that as part of its scheme to disclose only selective data, SMS omitted Broadlane's discounts from its response to the VA CT/MR audit and to the 2002 DSCP solicitation.  He cites an email exchange between Sasala and Brenda Lindsey at VA and SMS's response to the 2002 DSCP solicitation.[187]  He also points to assurances SMS representatives gave him during negotiations for contracts for CME while he was Vice President of Capital Medical Equipment Contracting Services at Broadlane.

Neither the documents nor the alleged statements made by SMS employees demonstrate that SMS omitted any material information during the CT/MR audit.  The email exchange discusses information about Alliance, another GPO, not Broadlane.  Alliance had no relationship to the CT/MR audit.

---

[186] *See* Regan Decl., ¶ 12 ("[T]he pre-award review[] provided the respective contracting officer[] with information and analysis regarding the commercial sales practices for Siemens . . . with specific recommendations to the contracting officer[] that identified discounts that [he] should seek to obtain during contract negotiations."); Statement by counsel for the government ("The government had the information that it wanted when it entered into the terms of the [CT/MR] contract").  Tr. of Hr'g on Order to Show Cause Why Thomas Should Not be Disqualified as a Relator (Dec. 14, 2010) at 227.

[187] Rel.'s Resp. Br. at 20; Rel.'s ID of False Statements, ¶ A.8; Rel.'s ex. 36 (July 10, 2002 emails between Lindsey and Sasala); Rel.'s ex. 88 (SMS's response to DSCP multi-modality contract solicitation).

The second set of documents is SMS's response to the 2002 DSCP solicitation, in which SMS discloses sales of CME to two other GPOs, Premier and Shared Services. The DSCP contract is not at issue. But, even if it were, Thomas does not proffer any evidence that DSCP requested information about SMS's sales of CME to Broadlane or that such information was relevant or material to the 2002 DSCP solicitation.

In fact, in connection with the 2002 CT/MR audit, SMS disclosed five transactions in which it had given Broadlane group buy discounts on CT equipment that exceeded the discounts SMS was offering VA. In these disclosures, SMS explained why the transactional discounts were higher than the contract discount offered to VA.[188] There is no evidence that anything was withheld.

Regarding the statements made to him during negotiations for group buy agreements, Thomas asserts that he "demanded" and "insisted" that SMS offer "the best possible discounts for Broadlane's customers" that were "greater than those offered to the Government" if it wanted "an opportunity to win Broadlane contracts."[189] SMS negotiators allegedly "assured [him] that the discounts they offered to Broadlane were greater than discounts offered to other customers, including the Government."[170] He claims these communications occurred in May and August of 2001 with Hibbits, Ryland and Friend in connection with negotiations for two ultrasound equipment contracts, and in negotiations from June through December of 2002 with Friend, Ryland and Tom McCausland, head of

---

[188] Def.'s ex. 71 (SMS audit disclosures on CT CME commercial accounts).

[189] Thomas Aff., ¶¶ 12-14.

[170] *Id.*, ¶ 12.

SMS's Customer Solutions Group[171] for eight CT/MR scanners, nuclear imaging and ultrasound equipment contracts.  This resulted in SMS winning the two ultrasound contracts, and four of the eight multi-modality contracts, awarded in January of 2003, after the CT/MR and ultrasound contracts at issue in this case had been awarded.[172]

These statements are vague, unsubstantiated representations.  Thomas has produced no evidence that the discounts offered to Broadlane were actually greater than discounts offered the government.  Thomas has produced no evidence of a specific discount on a specific piece of equipment given to Broadlane that was not disclosed to the government, or that a non-disclosed higher discount given to Broadlane was for the sale of CME under comparable terms and conditions.  Thus, these assertions do not support a claim that SMS failed to disclose to VA greater discounts than those given to Broadlane.

In summary, the two documents and the statements by SMS representatives that Thomas cites do not provide a basis from which one could conclude that SMS failed to disclose information about Broadlane when it should have or that the information was material.

---

[171] Except for Hibbits, Thomas did not depose these SMS negotiators nor submit any declarations from them.  Thomas did not question Hibbits during her deposition about communications between Hibbits and Thomas while he was at Broadlane.

[172] Thomas Aff., ¶¶ 12-14.  In the same affidavit, Thomas states that these negotiations took place at different times.  In one paragraph of the affidavit, Thomas alleges that he negotiated with SMS for MR scanner contracts between June and December 2002, while in another paragraph he alleges these negotiations took place in March 2002. *Compare* Thomas Aff., ¶ 25 *with* ¶ 14.  In fact, it was in March 2002 that SMS offered VA a 35% discount on MR scanner equipment, and VA awarded SMS the contract at that rate in September 2002. *See* Rel.'s exs. 19, 35.  It was in June through December 2002 that SMS offered Broadlane higher than 50% discount rates in negotiating for MR equipment. *See* Rel.'s ex. 21; Def.'s ex. 121.

Whether Thomas is mistaken about when the negotiations took place goes to his credibility, which is a jury question.  We do not take into consideration these discrepancies and self-contradictions.

<u>False Statement in the Response to the 2002 DSCP Solicitation</u>

Thomas contends that on October 29, 2001, in connection with the 2002 DSCP Contract solicitation, SMS falsely represented to DSCP that the "majority of our commercial business comes from members of" two GPOs: Premier Purchasing Partners and Shared Services Healthcare, Inc.[173]  He claims that this misrepresentation became apparent when, three months later, on February 8, 2002, in connection with a VA X-Ray CME audit, SMS listed Premier and Novation as its top two customers in its "Top 10 Commercial (GPO) Customers for the Period January 1, 2001 - December 31, 2001."[174]  The later "Top 10" list, which names SMS's top ten GPO customers and their respective sales volume for X-Ray equipment, shows that Premier and Shared Services accounted for only 42% of the sales. According to Thomas, this contradicted SMS's earlier representation in its October 29, 2001 submission to DSCP that Premier and Shared Services accounted for the majority of its GPO business.

The statements that Thomas is comparing relate to the 2002 DSCP contract and the 2002 X-Ray equipment audit.  As we discussed earlier, neither of these contracts is at issue.

In any event, the October 29, 2001 statement in response to the 2002 DSCP Contract solicitation is not false.  Contrary to Thomas's contention, the statement is not contradicted by the later "Top 10" list because the two do not relate to the same type of CME.  Rather, each is a response about different and unrelated equipment.

---

[173] Rel.'s Resp. Br. at 21; Rel.'s ID of False Statements, ¶ A.9; Rel.'s ex. 91 (Oct. 29, 2001 letter from Sasala to Dennan at DSCP).

[174] Rel.'s ex. 98 (Feb. 8, 2002 letter from Sasala to Palmatier at VA).

The October 29, 2001 statement that the majority of SMS's GPO business came from Premier and Shared Services was made in connection with the October 2002 multi-modality DSCP contract solicitation.  It describes SMS's top two GPO purchasers in *five different modalities*: *X-Ray*, *ultrasound*, *CT*, *MR and nuclear imaging*, and reflects data through only October 29, 2001.  In contrast, the list of SMS's "Top 10 Commercial (GPO) Customers for the Period January 1, 2001 - December 31, 2001" was produced on February 8, 2002 in connection with a 2002 *X-Ray equipment audit*.[175]  It reflects the top ten GPO purchasers of *X-Ray equipment* only for all of 2001, *not* the top ten purchasers of *multiple modalities*, including X-ray equipment, for part of 2001.  Additionally, SMS gave VA yet another "Top 10 GPO" list on July 16, 2002.  It was in connection with the *CT/MR audit*, which showed Premier and Novation as the top two purchasers of *CT* and *MR* equipment from April 1, 2001 to March 31, 2002.[176]

Because the two statements pertain to different contracts, modalities and time periods, the statement made on October 29, 2001 in connection with the DSCP contract solicitation is not false.  It cannot form the basis of a false claim relating to other contracts.

To show that SMS withheld higher GPO discounts from the government, Thomas points to an SMS internal comparative compilation of the largest discounts given during the 2005 SMS fiscal year.[177]   According to Thomas, the compilation shows that the government's discounts were often less than half of the highest commercial discount, and did not reach the average discount given to GPO customers.  He maintains that this

---

[175] This was produced in response to Solicitation No. M6-Q1-01.

[176] Def.'s ex. 126 (July 16, 2002 email from Sasala to Lindsey).

[177] Rel.'s ex. 46 (Discounts Summary) at Bates 000121619; Second Am. Compl., ¶ 34, ex. 6.

compilation proves that the government was "not treated as a 'most-favored' customer."[178] As evidence of SMS's knowledge that it was providing greater discounts to commercial customers than to the government, Thomas cites a February 1, 2005 SMS National Accounts meeting in Palm Springs, where the vice president of Strategic National Accounts, Robert Miller, allegedly presented the internal compilation of GPO and government discounts to SMS employees and warned them that SMS was "at significant risk of adverse consequences from the government" because of these improper discounting practices.[179]

Because it does not separate individual contract and transaction discounts, the chart does not show which GPO was given the highest contract or transactional discount. The entries on the chart reflect several pieces of data that have been averaged. Specifically, the right side of the chart shows the average contract discount awarded for each product modality for each GPO and the government.  Multiple product lines and discounts from multiple contracts are included in the calculation.  The chart reflects that the government received an average contract discount of 33% across all modalities and all product lines in fiscal year 2005 (October 1, 2004 - September 30, 2005), and between 30% and 44% discounts on individual modalities and product lines.  Three GPOs received  higher average discounts: Novation, 34%; HPG, 35%; and Kaiser, 42%.

The left side of the chart lists the average transactional discounts across all modalities and all product lines.  The average of these averaged discounts is 40%.  The highest average transactional discount for a single modality is 58%, which is for ultrasound

---

[178] Rel.'s Resp. Br. at 22-23.

[179] Thomas Aff., ¶ 24; Rel.'s Resp. Br. at 28.

equipment.  Additionally, the "Discount HI-LO Range" column on the chart reflects the highest to lowest transactional discount for each modality.  The highest discount ranges from 75% for ultrasound CME to 48% for nuclear imaging CME.[180]

Thomas is comparing the transactional discount figure of 75% for unspecified ultrasound CME to the government's average contract discount of 33% across all modalities and all product lines and the government's 30% to 44% contract discounts on individual modalities.  His superficial analysis is fallacious and misleading.  Because the chart averages multiple data and does not segregate individual contract or transaction discounts, one cannot determine which discounts were given to which GPO for which modality or product.  Thomas has made no attempt to obtain and analyze the various components that were used to compute the averages.  The figures reflected do not allow for a comparison of any discounts given to any GPO and the government.  Thus, the chart does not prove that SMS withheld higher GPO discounts from the government.[181]

Even if we assume the chart provided a basis for comparing commercial discounts to government discounts, there is no evidence that the government did not know about these larger discounts.  To the contrary, the only evidence in the record is that SMS told VA that it offered higher discounts to non-governmental customers.[182]

---

[180] Bertrand dep. at 746-51; Rel.'s ex. 46.

[181] Thomas argues that SMS's Rule 30(b)(6) witness was not prepared to testify as to the basis of the discount data on the chart.  Although it is true that Bertrand could not explain the *documentation* behind every chart entry, *e.g.*, he was not sure how many contracts were considered for each modality, nor did he know what information was in each contract upon which the chart was based, he did explain the sources of the data that led to the compilation of the figures on the chart.  Thus, he knew a sufficient amount of information to be able to demonstrate that the chart was not a reliable or relevant source of information from which to conclude what information SMS disclosed to the government about the contracts at issue here or when it was disclosed.

[182] *See, e.g.*, Def.'s ex. 71 (SMS audit disclosures on CT CME commercial accounts); Def.'s ex. 70 (SMS audit disclosures on MR CME commercial accounts).

Even if the government did not know about the discounts listed in the chart, there is no evidence that this information was pertinent to, or even in existence at the time of, the negotiations of the contracts at issue.  Those contracts were negotiated between April of 2001 through April of 2003.  The chart reflects discount data from October 1, 2004 to September 30, 2005.  Hence, the chart and the information cited in it could not have been used in the negotiations because the information in it did not exist.[183]

## False Statement on the DPI for the 2006 Joint VA/DSCP Multi-Modality Solicitation

Thomas's last false claim allegation relates to another contract that is not at issue. He argues that on its DPI submitted in response to the 2006 joint VA/DSCP multi-modality solicitation,[184] SMS misrepresented the discounts it had given to commercial customers. Thomas points to one statement of SMS's 30(b)(6) designee that someone at VAOIG informed SMS that its DPI submission was "incorrect."[167]

More than six months after VAOIG sent SMS its pre-award audit letter,[168] SMS resubmitted its DPI, changing its answer from "No" to "Yes" on questions of whether SMS had in effect discounts that result in lower net prices than what it was offering the government.  In the cover letter to DSCP submitting the amended DPI, SMS explained that it revised its DPI because it "determined that the division personnel who completed the

---

[183] Additionally, because it reflects transactions through the end of September 2005, the chart could not have been presented at the February 2005 National Accounts meeting as Thomas represents.  *See* Second Am. Compl., ¶ 34 and ex. 6; Thomas Aff., ¶ 24; Rel.'s ex. 46; Bertrand dep. at 746-51.

[184] This was Solicitation No. M6-Q8-06 for CT, MR, X-Ray and ultrasound CME, which began in 2006.

[167] Bertrand dep. at 303; Rel.'s ID of False Statements, ¶ A.6.

[168] Rel.'s ex. 27 (July 27, 2006 pre-award review letter for Solicitation No. M6-Q8-06).

[DPI] sheets misunderstood the requirements. The information provided in Section 4 of the DPIs represented data averaged at the modality level rather than reflecting discounting practices at the product level."[169]

Thomas asserts that because SMS only offered discounts at the product level and not at the modality level, its explanation that it mistakenly thought that the DPI required reporting of modality level discounts was "a contrivance."[170]   Thomas also notes that the DPI forms never mention the word "modality," further demonstrating that SMS's rationale for its purported mistake is dubious.[171]

The joint VA/DSCP multi-modality solicitation is not at issue.  Thomas does not assert that it is.  Thus, it cannot form the basis of a false claim in this action.

## Conclusion

There are no genuine issues of material fact as to whether any of the nine statements was false.  SMS submitted unrefuted evidence that these statements were true and that SMS employees did not knowingly submit any false statements.  Nor are there disputed issues as to whether any of alleged false statements was material to the government's decision-making.  Most importantly, in this action based upon a theory of fraudulent inducement, Thomas has failed to adduce sufficient evidence showing a genuine issue for trial on whether the government was misled into awarding the contracts to SMS and Acuson because it relied on any false statement or omission.  Without any

---

[169]  Rel.'s ex. 42 (Feb. 22, 2007 letter from Thomas Lengel, SMS Contract Administration Manager, to DSCP) at Bates 0002519.

[170]  Rel.'s Resp. Br. at 29-30.

[171]*Id.*

evidence of inducement or reliance, Thomas cannot sustain a false claim cause of action based on a fraudulent inducement theory.

Thomas incorrectly contends that all he must do is to show that SMS submitted a false statement to VA.  He insists he need not prove causation or inducement.  He is incorrect.

In discovery, SMS produced evidence explaining how the contracting process for the sale of CME to the government worked, both generally and  specifically with respect to the contracts at issue.  Included in this discovery was undisputed evidence of what information the government expected and required to be disclosed on the DPI.  Thomas made no attempt to dispute this evidence.

Specifically, the undisputed evidence shows that at the time it incorporated SMS and Acuson's final DPI submissions into the contracts at issue, VA accepted different interpretations of the DPI.  This happened twice after full audits, and once after full review of the DPI disclosures, without complaint by VA that the methodology was wrong.  SMS has presented uncontradicted evidence that VA did not expect all transactional discounts to be listed on the DPI.[172]   During the audits, SMS disclosed hundreds of individual commercial transactions that received higher discounts than SMS disclosed on its DPI. For the vast majority of them, the government did not mention or ask about them.  Nor did it request SMS to justify why they were not on the DPI.  Thus, when SMS completed the DPI for its NM submission in a similar fashion to the CT/MR DPI, it had no reason to believe that its method of disclosure was not correct.

---

[172] *See* Def.'s ex. 74 (July 15, 2002 email from Lindsey of VAOIG to Sasala enclosing a chart comparing transactional discounts to contract discounts in connection with CT/MR audit).

In fact, as to the three contracts at issue, VA incorporated the final DPI into the respective contracts.  As Regan declared, the government confirmed that it had complete, contractually required information and it had verified the information necessary to negotiate the contracts  This evidence, which is fatal to Thomas's claim, has not been challenged and stands undisputed.

For whatever reason, Thomas took no discovery of the government.  It appears his strategy was to proffer facts unrelated to the claims in this case to create a suspicion that SMS had acted in a fraudulent manner, without producing evidence that would prove or confirm his suspicion that the government was defrauded by any materially false statement or omission when it awarded the contracts at issue.  He intentionally avoided gathering evidence from the government.  If this was his strategy, it failed.

Thomas has not produced any evidence that the government relied upon or was misled by any material false statements or omissions made by SMS when it awarded the contracts at issue.   Therefore, because there is insufficient evidence from which a reasonable fact finder could find that the government was defrauded, SMS is entitled to summary judgment on all of Thomas's claims.